Alvin H. KRIGER, on behalf of himself
and others similarly situated,
Plaintiff,

v.

EUROPEAN HEALTH SPA, INC., OF
MILWAUKEE, WISCONSIN, a Wisconsin corporation, et al., Defendants.

No. 72–C–72.

United States District Court,
E. D. Wisconsin.

July 3, 1973.

See also D.C., 56 F.R.D. 104.

Lorinczi & Weiss by Robert K. Steuer, Milwaukee, Wis., for plaintiff.

Quarles, Herriott, Clemons, Teschner & Noelke by John S. Holbrook, Jr., and Larry J. Martin, Milwaukee, Wis., for Health Spa & Health Industries, Inc.

Foley & Lardner, by James P. Brody, Lawrence J. Bugge and Robert A. Christensen, Milwaukee, Wis., for First Wis. Nat'l Bank of Milwaukee.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

The plaintiffs seek statutory damages for violations of the Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., otherwise known as the Truth-in-Lending Act (TIL), alleging failure on the part of the defendants European Health Spa, Inc., of Milwaukee, Health Industries, Inc., and First Wisconsin National Bank of Milwaukee (First Wisconsin), to comply fully with the disclosure requirements of Regulation Z, 12 C.F.R. 226, the "four installment rule" promulgated by the Federal Reserve Board and upheld by the United States Supreme Court in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The first two named defendants will be referred to in this decision collectively as "Spa".

Cross-motions for summary judgment have been filed by each of the parties to this action, along with an agreed stipulation of facts, and there is no issue as to any material fact. It is my conclusion that, for the reasons hereinafter discussed, judgment should be entered in favor of the plaintiffs and against the defendants. See Rule 56, Federal Rules of Civil Procedure.

The violations found to exist herein center around an agreement entered into between the defendants Spa and First Wisconsin at the onset of Spa's Milwaukee operation in 1970. This agreement created the only account maintained by First Wisconsin involving a so-called "unitary" cash and installment price and on which no finance charge was separately stated. In the event of prepayment, it involved no rebate of unearned finance charges.

Though it was under no contractual obligation to do so, First Wisconsin ultimately purchased 1540 of the 1740 promissory notes or retail installment contracts tendered by Spa, at what proved to be a constant 16% discount rate. These 1740 represented every one of the non-cash memberships garnered by Spa during the relevant period.

Eventually, 60 of the 1540 members' notes purchased by First Wisconsin defaulted and were repurchased by Spa, pursuant to recourse provisions contained in the aforesaid agreement.

Spa customers were charged a set fee, regardless of whether payment was to be immediate in cash, as it was in only 35 of 1775 transactions, or over a period of time in installments, as it was in the plaintiffs' cases. Spa listed "none" and "0%" in the installment contract form disclosures for "finance charge" and "annual percentage rate", respectively.

In my opinion, such disclosures, required by TIL, were erroneous because the defendants Spa were in fact acting as conduits for the consumer credit actually extended by First Wisconsin. See Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955 (N.D.Ill.1972). Correct disclosures would have reflected as a "finance charge" to the plaintiffs the amount of the discount obtaining in the arrangement between the defendants Spa and First Wisconsin. In addition, the "cash price" disclosed should have been the discounted amount received by Spa from First Wisconsin upon the assignment of the plaintiffs' notes.

The defendants Spa and First Wisconsin urge that the firm "unitary price" involved no "finance charge" and that any cost of extending credit to members which was incurred by Spa ought best be characterized as the general cost of credit which is passed on to all customers, including cash customers, as overhead. Moreover, the defendants vigorously deny the validity of any characterization of their relationship as one involving either a "front man", a "conduit" or a "prime mover". Instead, they argue the existence of a bona fide, arms-length, assignor-assignee business relationship and state that there exists a legitimate business purpose behind every one of the challenged aspects of their agreement and relationship.

15 U.S.C. § 1631(a) provides:

"Each creditor shall disclose clearly and conspicuously, in accordance with

the regulations of the Board, to each person to whom consumer credit is extended, and upon whom a finance charge is or may be imposed, the information required under this [chapter]."

The threshold issue here turns on whether First Wisconsin is a "creditor" subject to TIL. A creditor is one who regularly extends or arranges for the extension of credit for which a "finance charge" is required. See TIL 103(f), 15 U.S.C. § 1602(f).

Section 106(a), 15 U.S.C. § 1605(a) makes it clear that this refers to the extension of credit to consumers. The terms of Regulation Z exclude any extension of credit between corporations.

I am persuaded that, on the facts presented here, First Wisconsin is a "creditor" within the meaning of TIL, because it extended or arranged the extension of credit to consumers through the "conduit" of Spa. On this point, the court in Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955, 964 (N.D.Ill.1972) stated:

"  .   .   . assignees of consumer retail installment sales contracts who regularly extend or arrange for the extension of credit to consumers through the assignors of such contracts may themselves be 'creditors' within the meaning of, and subject to liability under, Truth-in-Lending. To put it another way, lenders may not escape Truth-in-Lending status as creditors by using sales companies as 'front men'."

■ Clearly, First Wisconsin regularly extended or arranged for the extension of consumer credit. We have already noted that 100% of the obligations of members were tendered to First Wisconsin and a substantial percentage (about 88%) were accepted for discounting. Of those accepted, only a few (about 4½%) were subsequently in default and repurchased. Also, Spa was discounting with only one financial institution during the relevant period of time. In addition, the fact that the rate of discount remained unchanged throughout this period supports the "conduit" theory.

The fact that First Wisconsin checked the credit references of each member and had the final choice of accepting or rejecting a particular note further supports the conclusion that First Wisconsin was extending credit directly to members, including the plaintiffs. Thus, the "cash price" of the membership was the discounted amount paid by First Wisconsin to Spa and the balance of the note constituted an undisclosed "finance charge" for purposes of TIL.

15 U.S.C. § 1605(a) defines a "finance charge" as follows:

"Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable *directly or indirectly* by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit, including any of the following types of charges which are applicable:

(1) Interest, time price differential, and any amount payable under a point, *discount* or other system of additional charge. .   .   ." (emphasis added).

Cf. 12 C.F.R. 226.4(a) (Regulation Z).

I conclude that this definition of "finance charge" includes the amounts charged here for the extension of credit to finance a transaction wherein the amount to be charged solely for the ultimate extension of credit was prearranged and determinable at the time the obligation was entered into by the plaintiffs. I find unconvincing the defendants' argument that there was not imposed a "finance charge" as defined in 15 U.S.C. § 1605 and 12 C.F.R. § 226.4(a) for the reason that all parties agree that the notes were for a "unitary price", *i. e.*, whether a membership purchaser paid a lump sum or executed a promissory note or installment contract

payable in 24 monthly installments, the price was the same. The identical contention was presented in Strompolos v. Premium Readers Service, 326 F.Supp. 1100, 1103 (N.D.Ill.1971) wherein the court commented:

" . . . Neither the law, the Federal Reserve Board nor the courts are so simplistic as to believe that a person in the business of extending long term credit should be permitted in effect to abolish the Truth-in-Lending Act by merely charging a single 'cash or credit' price knowing full well that the great bulk of its customers will never pay in less than, for example, thirty months."

Cf. Joseph v. Norman's Health Club, Inc., 336 F.Supp. 307 (E.D.Mo.1971). It should be noted at this time that the defendants' attempt to minimize the impact of *Garza, Joseph* and *Strompolos* because of the Supreme Court's ruling in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), is without merit.

Defendants argue that the theory adopted today by this court requires the disclosure as a finance charge of an amount, the payment of which cannot be avoided by the prepayment in cash and which is not comparable to the cost of borrowing money in order to pre-pay for cash; that, in effect, this court would require the disclosure to the customer of information which he cannot use in the manner intended under TIL. Nevertheless, I believe that the unitary price system adopted by Spa served no function other than that of concealing the real cost of credit. Producing nothing more than a theoretical cash price, the fact that only 35 out of 1775 customers during the time in question paid cash is cogent support for the belief that the defendants did not expect to sell their services on that basis and that the "unitary price" was but a marketing tool designed to convince the customer that he was getting a free extension of credit. This runs against the policy behind TIL,

which, according to the Supreme Court in *Mourning* is:

" . . . to enhance the consumer's ability to make an informed choice, even if finance charges were hidden . . . [E]ven as to sales in which it was impossible to determine what, if any, portion of the price recompensed the creditor for deferring payment, the regulation (Z) at least required that the consumer be provided with some information which would enable him to make an informed economic choice [93 S.Ct. at 1660] . . . Some may claim that it is a relatively easy matter to calculate the total payments to which petitioner was committed by her contract with respondent; but at the time of sale, such computations are not often encouraged by the solicitor or performed by the purchaser." (93 S.Ct. at 1664).

While the Federal Reserve Board has ruled that, before a discount must be included in the finance charge, the consumer must prove that the discount was in fact "added to" his price as an incident of credit, the fact is that Spa's scheme merely avoided this procedure by "adding" in advance, with an expectation that very few (2%) would pay cash in advance anyway.

Defendants say that the tender by Spa to First Wisconsin of all of its promissory notes from installment members is explainable by "convenience", rather than on the plaintiffs' "conduit" theory. They insist that the rejection rate of 200 out of some 1740 notes tendered to First Wisconsin by Spa somehow negates the idea that Spa was the "front man" for First Wisconsin, the "prime mover" in the credit transactions contemplated here. However, it is neither unreasonable nor unlikely that a "prime mover" should control his "front man" to some extent. The fact that 60 or so notes were repurchased by Spa upon default merely represents a risk assumed by Spa in its agreement with First Wisconsin; if it placed a crimp in the conduit at times, in the long run the impact

of such defaults appear to have been balanced somewhat by the fact that Spa did receive 100%—instead of 84%—of the unitary price in those transactions which were entered into by it with consumers on a cash basis.

■ Spa's argument that its cost of finance was "absorbed" is not substantiated on the stipulated facts. Since virtually no cash customers were in existence who could "absorb" the credit cost charged to plaintiffs and other installment customers, I find that the charge for financing was "passed on" to the installment purchasers. Of the total price charged to each plaintiff, 84% thereof represented the "cash price" as defined in Regulation Z, 12 C.F.R. § 226.2(i) and 16% represented the "finance charge" under 15 U.S.C. § 1605(a) and 12 C.F.R. § 226.4(a). The term "cash price" as defined in 12 C.F.R. § 226.2(i) means the price at which the creditor offers, in the ordinary course of business, to sell for cash. The definition is not limited to the price at which the offer is made to the consumer, but rather refers to offers made in the ordinary course of its business. Based on the facts before this court, it is clear that in the ordinary course of its business, Spa did not sell its services for cash at the prices quoted to customers. Such sales were the exception rather than the rule.

The definition of "cash price" should not be limited to the price offered to customers lest creditors effectively abolish TIL by adopting illusory pricing systems like the one involved here.

Therefore, it is ordered that the defendants Spa's and First Wisconsin's motions for summary judgment in this matter be and hereby are denied.

It is also ordered that the plaintiffs' motion for summary judgment be and hereby is granted, and that the plaintiffs may present for signature a proposed judgment embodying all elements of the relief sought herein, pursuant to 15 U.S.C. § 1640(a).