386 F.Supp. 780 (1974)
Marjorie JOSEPH et al., Plaintiffs,
v.
NORMAN'S HEALTH CLUB, INC., et al., Defendants.
Barbara C. MORSE et al., Plaintiffs,
v.
NORMAN'S HEALTH CLUB, INC., et al., Defendants.
John M. YOST, Plaintiff,
v.
NORMAN'S HEALTH CLUB, INC., et al., Defendants.
Vincent GRECO, Plaintiff,
v.
NORMAN'S HEALTH CLUB, INC., et al., Defendants.
Nos. 70C 416(4), 70C 633(4), 71C 3(4) and 71C 253(4).
United States District Court, E. D. Missouri, E. D.
December 26, 1974.
As Amended February 28, 1975.
*781 Green & Lander, Clayton, Mo., for plaintiffs.
Schramm & Morgenstern, Donald R. Wilson, Clayton, Mo., Thomas, Busse, Cullen, Clooney, Weil & King, Rosecan & Popkin, St. Louis, Mo., for defendants.

OPINION
NANGLE, District Judge.
These four above-styled consolidated class actions are before the Court following a non-jury trial on the issue of liability only.
In each of the four actions, the plaintiffs represent classes of individuals who purchased "lifetime" memberships in health clubs that did business as Norm Sandon's Health Clubs and who, *782 in connection with becoming health club members, executed promissory notes that were assigned to one of the defendant finance companies. In all of the four actions, the eleven Sandon-related corporate defendants are as named in Finding of Fact No. 2, below. Each of the four actions names different finance companies as defendants: No. 70 C 416 (4) names Consolidated Finance Corporation; No. 70 C 633 (4) names Boston Securities, Inc. of Kirkwood, Boston Securities, Inc. of Florissant, Boston Securities, Inc. of Moline Acres, Boston Securities, Inc., and Boston Securities Corporation of Missouri; No. 71 C 3 (4) names Mercury Acceptance Corporation; and No. 71 C 253 (4) names Sentinel Holdings Company d/b/a Sentinel Securities Corporation. At trial no evidence was offered against defendants Mercury Acceptance Corporation or Sentinel Holdings Corporation d/b/a Sentinel Securities Corporation.
Each of the four actions was originally in two counts. Count I sought damages under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, for alleged violations of Section 10(b) of that Act, 15 U.S.C. § 78j, and Rule 10b-5 (17 CFR 240.10b-5) promulgated thereunder. However, upon motions of the defendants, Count I of each action was dismissed. 336 F.Supp. 307 (December 6, 1971.)
The remaining Count II in each action seeks damages for violation of Section 121 of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1631(a),[1] and Regulation Z, 12 CFR Part 226,[2] promulgated thereunder. More specifically, plaintiffs claim damages for defendants' failure to disclose certain credit information to plaintiffs when plaintiffs executed promissory notes in connection with becoming "lifetime" health club members.
In Action No. 70 C 633 (4) defendant Boston Securities, Inc. of Moline Acres has counterclaimed against plaintiffs Barbara C. Morse and Lynn Joseph[3] for amounts due under the promissory notes which are the subjects of their claims.
By order of October 4, 1973, the Court ruled that these four actions may proceed as class actions only with respect to the issue of liability. The counterclaims of Boston Securities, Inc. of Moline Acres will be deferred until the issue of damages is taken up by the individual plaintiffs.
Being fully advised in the premises of the actions, the Court makes the following findings of fact and conclusions of law:

FINDINGS OF FACT
1. (a) On July 10, 1960, Norman Saindon opened a physical fitness facility, or health club, in Dellwood, Missouri, a suburb of St. Louis. Saindon came to St. Louis to work at a Holiday Health Club at the same Dellwood location. Before coming to St. Louis he worked for two years at a Holiday Health Club in Denver; before that, he coached Young America League football and baseball in Colorado. When he arrived in St. Louis, Saindon found that the local Holiday Health Club proprietor wanted to liquidate.
(b) Saindon intended to provide indoor physical fitness and development facilities for men and women. He spoke at many social and business gatherings soliciting patrons as health club members.
2. As the membership grew Saindon opened health clubs at various locations. Each health club was organized as a Missouri corporation with Saindon as a director and its chief executive officer, or president. His wife, Barbara, was an officer and a director of each corporation as was James C. Sailor, a certified *783 public accountant. Sailor administered the fiscal operation of the health clubs. The corporations were named as follows:
Norman's Health Club, Inc.;
Lindell Fitness, Inc.;
Downtown St. Louis Fitness, Inc.;
Crestwood Fitness, Inc.;
Family Fitness, Inc.;
Greater St. Louis Fitness, Inc.;
Midtown St. Louis Fitness, Inc.;
Clayton Fitness, Inc.;
St. Louis Fitness, Inc.; and
Norm Sandon Enterprises, Inc.
Each of these corporations operated a physical fitness facility, except Norm Sandon Enterprises, Inc., which operated the health clubs' central administrative office. Hereinafter, the corporations and the health clubs will be referred to collectively as the "health clubs".
3. The health clubs sold memberships of varying durations. Most noted was the "lifetime" membership that allowed the member the use of club facilities for his lifetime. Each plaintiff herein purchased lifetime memberships, as did ninety-eight per cent of all members. From February, 1966, to August, 1967, lifetime memberships were sold for $300.00; thereafter, they were sold for $360.00.
4. A person became a health club member ("lifetime" or otherwise) by arranging for payment of the membership price and by receiving a membership card. Saindon, or his salesman, allowed the prospective member to arrange for payment either in cash, but only if the person requested, or by the execution of a promissory note.[4]
5. The few members who so desired were allowed to make a lump sum cash payment directly to a health club within forty-five days. When they did so, they were allowed a price reduction of ten per cent. Before July, 1969, approximately fifty members paid cash, less than one per cent of all "lifetime" members. Thereafter, purposely to avoid conflict with TILA, both Saindon and Sailor directed membership salesmen to avoid such cash payments. Nevertheless, after July, 1969, four such payments were accepted.
6. (a) The fiscal operation of the health clubs was geared for payment by promissory notenot cash payments directly to the health clubs. Most members executed promissory notes that provided for payment in twenty-four monthly installments. Saindon believed that these monthly amounts ($12.50 each when the price of the lifetime membership was $300.00 and $15.00 when said price was $360.00) were within the financial means of the persons he solicited and would provide a satisfactory financial base for the health clubs.[5]
(b) The health clubs received the necessary operating capital by assigning the members' promissory notes to various finance companies, including those who are defendants herein, in exchange for cash in amounts less than the face amounts of the notes. Saindon and Sailor believed the health clubs had to receive seventy per cent to eighty-five per cent of the face amount of the notes from the finance companies to remain solvent.
7. When the members executed the promissory notes, they were not told the notes would be assigned to finance companies. This was for the reason that not all such notes were assigned. Those which no finance company would accept were kept by the health clubs.
8. As soon as a person arranged for the payment of the membership price by signing a note or by agreeing to pay in cash, he received a membership card and immediately became entitled to full use of the clubs' facilities. A member's use of club facilities was not dependent upon a subsequent acceptance of his note by a finance company.
*784 9. At the time a prospective member met with Saindon or a health club salesman to execute a promissory note, the salesman would enquire into the applicant's financial background. He recorded such data as the name of applicant's employer, the name of the spouse, applicant's salary, and credit references  at the places provided therefor on the promissory note itself.
10. (a) That portion of the promissory note form that the members executed before July, 1969, was as follows:

 ST. LOUIS, MO. _______________ DATE __________ 19__
PROMISSORY NOTE FOR VALUE RECEIVED, I OR WE PROMISE TO PAY $_____________
 Norm Sandon's Health Club
TO _______________________________________________________ OR ORDER
 (DEALER)
at the place designated by the holder hereof. With interest after
maturity until paid, at the maximum lawful contract rate.
PAYABLE IN ___________ CONSECUTIVE MONTHLY INSTALMENTS OF $__________________
AND FINAL INSTALMENT OF $_______________ BEGINNING ________________ 19__
Each maker, guarantor, indorser and surety hereof hereby waives
presentment, notice of dishonor, protest and notice of protest, and
diligence in bringing suit hereon, and consents that the time of
payment of this indebtedness, and any or all installments thereof
may be extended from time to time without notice and without affecting
their liability. Each installment delinquent 10 days or more shall
bear a delinquency charge of five percent of the installment; provided
that a minimum charge of one dollar may be made.
If any of the said instalments, or any part thereof, are not paid when
due, then the entire indebtedness then remaining unpaid or the
delinquent portion thereof, shall, at the option of the holder hereof
and without notice or demand, become immediately due and payable and
the undersigned agrees to pay the cost of collection, including
attorney's fees as provided by law.
 NOTICE TO BUYER
1. DO NOT SIGN THIS NOTE BEFORE YOU READ IT OR IF IT CONTAINS ANY
 BLANK SPACES.
2. YOU ARE ENTITLED TO AN EXACT COPY OF THE NOTE YOU SIGN.
3. THERE IS NO INTEREST CHARGE TO BE ADDED TO THIS NOTE.
4. THIS NOTE IS NON-CANCELABLE.
 SIGN HERE ______________________________________
 ______________________________________

*785 (b) That portion of the promissory note which applicants executed on and after July 1, 1969, was as follows:

PROMISSORY NOTE St. Louis (County), Mo. __________ Date _______ 19__
FOR VALUE RECEIVED (My Norm Sandon's Health Club Membership Card), I
or we unconditionally promise to pay $_____________
 Norm Sandon's Health Club
 TO _____________________________________________ OR ORDER
 (DEALER)
 at the place designated by the holder hereof,
PAYABLE IN _______________ CONSECUTIVE MONTHLY INSTALMENTS OF $___________
BEGINNING _____________________ 19__
Each maker, guarantor, indorser and surety hereof hereby waives
presentment, notice of dishonor, protest and notice of protest,
and diligence in bringing suit hereon, and consents that the time
of payment of this indebtedness, and any or all installments
thereof may be extended from time to time without notice and
without affecting their liability.
If any of the said installments, or any part thereof, are not paid
when due, then the entire indebtedness then remaining unpaid or
the delinquent portion thereof, shall, at the option of the holder
hereof and without notice or demand, become immediately due and
payable and the undersigned agrees to pay the cost of collection,
including reasonable attorney's fees as provided by law.
 NOTICE TO BUYER
1. DO NOT SIGN THIS NOTE BEFORE YOU READ IT OR IF IT CONTAINS
 ANY BLANK SPACES.
2. THE FINANCE CHARGE IS $0 AND THE ANNUAL PERCENTAGE RATE IS 0%.
3. MY SIGNATURE BELOW ACKNOWLEDGES RECEIPT OF MY NORM SANDON'S
 HEALTH CLUB MEMBERSHIP CARD AND OF AN EXACT COPY OF THIS NOTE.
4. THIS NOTE IS NON-CANCELLABLE.
 SIGN HERE _____________________________________
 _____________________________________

(c) These promissory note forms were the only documents received by members that disclosed to them the terms of the purchase of the memberships.
*786 11. The two promissory note-credit information forms, partially set out above, were acquired by the health clubs directly from a local printing company. The forms were not provided by the finance companies. The form set out in Finding No. 10(a) was changed to that set out in Finding No. 10(b) to accomplish two ends. First, at Saindon's insistence the reference to the late payment charges was eliminated to overcome sales resistance; second, on the advice of the health clubs' legal counsel, the information regarding the finance charge and the annual percentage rate was added.
12. (a) Defendant Consolidated Finance Corporation ("Consolidated") is a corporation organized under the law of Missouri for the purpose of engaging in the small loan business.
(b) Consolidated began accepting the Sandon Health Club promissory notes during the summer of 1968. The relationship between the health clubs and Consolidated was established in a telephone conversation between Donald Berra, an officer of Consolidated, and James Sailor. They agreed that, if the health clubs offered members' promissory notes for sale to Consolidated, and if Consolidated desired to accept after investigating the member's credit standing, Consolidated would purchase them at agreed upon prices. There was no obligation by the health clubs to offer the notes and no obligation by Consolidated to accept an assignment of them. Consolidated initially agreed to pay the health clubs $275.00 for those $360.00 notes it decided to accept. As Consolidated found it more difficult to enforce payment on the notes, it agreed to pay the health clubs less and less  ultimately as little as $225.70. During the one-year period immediately preceding the commencement of Civil Action No. 70 C 416(4) on August 19, 1970, the health clubs assigned two thousand four hundred lifetime membership promissory notes to Consolidated in exchange for previously agreed upon sums of money. Included in this number are the notes executed by the plaintiffs named in that action.
13. (a) Boston Securities, Inc. of Kirkwood, Boston Securities, Inc. of Florissant, Boston Securities, Inc. of Moline Acres, Boston Securities, Inc., and Boston Securities Corporation of Missouri (collectively "Boston"), defendants in Civil Action No. 70 C 633(4) are Missouri corporations organized to engage in the small loan business.
(b) Boston began doing business with the Norm Sandon Health Clubs on July 23, 1968, when Sailor and Lester Perlmutter, an officer of Boston, executed a document captioned "Master Dealer Agreement". By this Agreement the health clubs indicated a desire to sell Boston promissory notes, and agreed that, if Boston agreed to purchase the notes on an individual basis, the further provisions of this Agreement would apply. The Master Dealer Agreement included provisions dealing with warranties and rights, collections, holdback, reserves, termination of the Agreement, and waiver of rights. It also provided, in paragraph 2, for reassignment of notes to the health clubs in exchange for payment of the face amount of the note "less any unearned discount, computed under the direct ratio refund method sometimes called the Rule of 78ths".
14. After the execution of the Master Dealer Agreement, Sailor executed a document printed on Boston stationery captioned "Loan Agreement". This Agreement document also recited provisions of the relationship between the health clubs and Boston. It provided inter alia a procedure for approving notes as follows:
Immediately after the [Sandon] "Club" secures contract (Exhibit "A") [to this Agreement] from its prospective member for the payment of the member's membership, and the note (Exhibit "A") the "Club" will mail the note to the "Lender" to secure approval of the "Lender". Based on the information therein the "Lender" will make every reasonable effort *787 to accept or reject the contract within one (1) day of the time of receipt. The note will be purchased upon satisfactory credit investigation of the maker.
It is understood that the "Lender" will have the right of refusal on any note submitted. The "Lender" will immediately return notes it rejects according to Schedule Exhibit "B" and disburse on notes which it purchases. Both the "Club" and the "Lender" will fully cooperate with each other in this regard.
Attached to this Agreement as Schedule B was a schedule of the types of health club memberships, the membership prices, the number of installments for each type membership, the amounts Boston would discount from the face value of the notes, the amounts held in reserve, and the amounts Boston would pay to the health clubs.
15. During the one-year period immediately preceding the commencement of Civil Action No. 70 C 633 (4) on December 11, 1970, the health clubs assigned eight hundred sixteen lifetime membership promissory notes to Boston in exchange for agreed upon sums of money. Included in this number are the notes executed by the plaintiffs named in this action.
16. During their existence, the health clubs assigned different promissory notes to at least seven finance companies at various negotiated prices. However, Consolidated and Boston purchased ninety-five per cent of them. Between July 1, 1969, and August 10, 1970, all of the health clubs' $360.00 notes were assigned to either Consolidated or Boston.
17. The procedural steps were similar whereby the health clubs offered the notes to either Consolidated or Boston. After the member executed the promissory note, the health clubs notified the finance company by phone or mail of the note and offered to sell it. The finance company then investigated the credit background of the member and contacted the member to verify the member's obligation on the note. Then, if the finance company agreed to purchase the note, a payment coupon book was mailed to the member and a check for the purchase price was mailed to the health clubs. If the finance company rejected the offer to purchase the note, it returned the note to the health club or otherwise indicated its rejection. The health club would thereafter offer to sell it to another finance company or would retain it.
18. In their records and business operations, both Consolidated and Boston treated these notes purchased from the health clubs in a manner similar to the way it treated notes from other customers, such as direct loan debtors. The transactions were recorded in journals with the other customers. The health club member would be solicited for direct loans, would be advised to maintain a good "credit record" with the finance company, and would be contacted by a collection agency, if he became delinquent in his payments.
19. No employee, officer, director or shareholder of the health clubs was an employee, officer, director or shareholder of either Boston or Consolidated.
20. All notes sold by the health clubs to Boston or Consolidated were assigned by endorsement "without recourse". The finance companies relied solely upon their investigation of the credit worthiness of the members when considering the acceptance of the notes.
21. None of the health clubs' physical fitness equipment or leasehold improvements were financed by Boston or Consolidated.
22. In 1970 the finance companies had less capital with which to purchase the health club notes. The operating capital of the health clubs lessened. Members became delinquent in their payments. The finance companies became more selective in the notes they accepted. Ultimately the health clubs became insolvent. On February 24, 1971, involuntary bankruptcy proceedings *788 were commenced in this Court against all corporate defendants herein, except Norm Sandon Enterprises, Inc. On March 22, 1971, these corporate defendants were adjudged bankrupt.

CONCLUSIONS OF LAW
The Court has subject matter jurisdiction over these actions, as granted by TILA; however, suit must be brought within one year from the date of the occurrence. 15 U.S.C. § 1640(e). TILA became effective July 1, 1969[6].
The ultimate issues regarding liability presented by these actions are three:
(1) Were the disclosures of information required by TILA and Regulation Z properly made to the plaintiffs?
(2) If (1) is answered negatively are the health clubs liable therefor either (a) as arrangers or, (b) as extenders of credit[7]?
(3) If (1) is answered negatively, are defendants Boston and/or Consolidated liable therefor either (a) as extenders of credit or, (b) as assignees of the promissory notes executed by plaintiffs?
For the reasons given below, the Court answers all these issues negatively, with the exception of 2(b) which it answers affirmatively.
TILA requires the disclosure of certain information by creditors, as defined by TILA and Regulation Z, "in connection with each consumer credit sale not under an open end credit plan". TILA § 1638(a); see also TILA § 1631(a). Boston makes the preliminary argument that no "consumer credit" was extended by the health clubs in connection with the sale of the health club memberships. TILA § 1602 defines "consumer credit" as follows:
(e) The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.
* * * * * *
(h) The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes.
Regulation Z § 226.2 provides:
(k) "Consumer credit" means credit offered or extended to a natural person, in which the money, property, or service which is the subject of the transaction is primarily for personal, family, household, or agricultural purposes and for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments. "Consumer loan" is one type of "consumer credit".
Boston asserts that plaintiffs' purchases of the "lifetime" health club memberships involved neither money, services, nor property. The Court disagrees. Upon receipt of a membership card and after arranging with the health clubs for the payment of the purchase price (either in cash, by credit card, or by execution of a promissory note), plaintiffs became entitled to some use of the health clubs' physical fitness equipment or related property. They also became entitled to services of the health club personnel in relation to the operation and administration of the facilities and the physical fitness programs offered. Therefore, both "property" and "services" *789 were the subjects of the membership sale transactions.

THE PROMISSORY NOTES
The only disclosures made to plaintiffs of information, as required by TILA and Regulation Z, were made on the faces of the promissory notes executed by plaintiffs after July 1, 1969. See Finding No. 10(b) above. Plaintiffs correctly assert that certain required disclosures were not made and that some information disclosed was inaccurate. The Court concludes that violations of TILA and Regulation Z occurred in the following respects:
1) Cash price. The promissory notes used on and after July 1, 1969, failed to disclose the "cash price" of the membership as required by TILA § 1638(a)(1) and Regulation Z § 226.8(c)(1). "`Cash price' means the price at which the creditor offers, in the ordinary course of business, to sell for cash the property or services which are the subject of a consumer credit transaction." Reg. Z § 226.2(i). Consolidated argues that the cash price of the lifetime membership was disclosed as the amount of a member's full obligation as set out on the face of the note, i. e. $360.00 for lifetime memberships. However, the Court has found that, after July 1, 1969, when a member was allowed to make a lump sum payment in cash for the membership, he paid less than $360.00. The paucity of members who paid in cash after July 1, 1969, does not detract from the conclusion that there did exist a cash price less than $360.00 which was not disclosed on the notes[8].
2) Use of term "cash price". Even if the $360.00 amount was the "cash price", that term was not used to characterize the amount as is required. Reg. Z § 226.8(c)(1).
3) Total amount to be financed. The subject promissory notes failed to disclose the "total amount to be financed". TILA § 1638(a)(5). That amount is the sum of (1) the difference between the cash price and the sum of any downpayments, TILA § 1638(a)(3), and (2) all other charges included in the credit extended but not part of the finance charge. TILA § 1638(a)(4). Plaintiffs have failed to prove the existence of downpayments or "other charges". Therefore, the "total amount to be financed" remained the "cash price". Since the cash price was not accurately disclosed it must follow that there was no accurate disclosure of the "total amount to be financed" as required.
4) Finance charge. The subject promissory notes failed to disclose the applicable finance charge. TILA § 1638(a)(6); Reg. Z § 226.8(c)(8)(i). The notes recited that the amount of the finance charge was "$0". However, included in the definition of "finance charge" are "time price differential, and any amount payable under a point, discount, or other system of additional charges". TILA § 1605(a)(1); see also Reg. Z § 226.4(a)(1). The Court believes that the health clubs imposed a finance charge, as defined by TILA, upon the plaintiffs in the amount the $360.00 membership price would have been reduced had plaintiffs paid cash within the required time. Cf., Reg. Z § 226.8(o)(iv). Therefore, it is unnecessary to determine whether, under the "four installment" rule of Regulation Z, 12 CFR § 226.2(k), the imposition of a finance charge was concealed by a unitary cash and installment pricing system. Strompolos v. Premium Readers Service, 326 F.Supp. 1100, 1103 (N.D.Ill.1971).
5) Annual percentage rate. The notes' statement that the annual percentage rate was "0%" was inaccurate and a violation of the disclosure requirements. *790 TILA § 1638(a)(7); Reg. Z § 226.8(b)(2). The Court has previously concluded that a finance charge was imposed by the health clubs. Therefore, the expression of that finance charge as an annual percentage rate could not have been 0%.

LIABILITY OF HEALTH CLUBS AND FINANCE COMPANIES
Plaintiffs assert that the health clubs are liable as "creditor-arrangers" for the extension of credit by the finance companies to the plaintiffs. This liability is founded on the theory that the health clubs were "conduits" for credit from the finance companies to the plaintiffs and for the finance charge from the plaintiffs to the finance companies. 336 F.Supp. at 318. In so arguing plaintiffs consider the difference between the notes' face obligations and the amounts paid by the finance companies as the finance charges that were required to be disclosed. However, this theory must be found in an application of Regulation Z's definition of "arrange for the extension of credit". 12 CFR § 226.2(f). This definition, as follows, provides no such application:
"Arrange for the extension of credit" means to provide or offer to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the credit terms and participates in the preparation of the contract documents required in connection with the extension of credit. It does not include, honoring a credit card or similar device where no finance charge is imposed at the time of that transaction. (emphasis added).
Although the health clubs provided the promissory note forms, and recorded the plaintiffs' credit data thereon, when a plaintiff executed a note, there was no relationship between the health clubs and any finance company whereby the finance company was then obligated either at that time or later to accept the transfer of the note and to pay money therefor to the health clubs. When the plaintiffs executed and delivered the notes and received their membership cards with the concomitant membership rights, they received credit directly from the health clubs. The health clubs were the note payees. If no finance company thereafter accepted a transfer of a note, the member retained his membership right and the health clubs retained the note. It, therefore, must follow that the health clubs alone are liable as "creditor-extenders" of credit.
Plaintiffs point to the business policy of the health clubs to assign the notes whenever possible, and to the "agreements", written and oral, according to which the health clubs and the finance companies dealt with one another. They also point to the finance companies' post-assignment practice of treating the plaintiffs as they did their direct loan customers. These facts do not establish a relationship between the finance companies and the health clubs or the plaintiffs which is a sufficient basis for liability that was affixed when plaintiffs executed the notes. The disclosures required by TILA and Regulation Z must be made "before the credit is extended", TILA § 1638(b), or "before the transaction is consummated". Reg. Z § 226.8(a).
The rulings of those courts which have concluded that a "conduit" relationship was pleaded or proven do not persuade this Court that such a relationship was proven herein.
In Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955 (N.D.Ill.1972), the Court denied the finance companies' motion for summary judgment. It ruled, inter alia, that the "subsequent assignee" language of TILA § 1641, treated below, could be interpreted as supporting a "conduit" theory cause of action against the finance companies within TILA's definition of "creditor"; and that there was shown the existence of a *791 "Collateral Loan Agreement" and a long relationship between the health club and the finance companies upon which a finding could be made later that the finance companies were "creditors". The Court stated that "reasonable minds could differ" on the finance companies' status as creditors. 347 F.Supp. at 965. By its ruling it looked to a full development of the facts at trial.
In Philbeck v. Timmers Chevrolet, Inc., 361 F.Supp. 1255 (N.D.Ga.1973), rev'd on other grounds, 499 F.2d 971 (5th Cir. 1974), reh. den., 502 F.2d 1167 (1974), the Court concluded, on motion for summary judgment, that defendant General Motors Acceptance Corporation ("G.M.A.C.") was a "creditor" of the plaintiff automobile purchaser, and that the defendant automobile sales dealer was a "conduit". By stipulation and affidavit it was shown that G.M.A.C. prepared the subject contract that plaintiff executed and that when a person purchases an automobile from the dealer the following events occurred:
1) a prospective purchaser in need of financing is given by the automobile dealer a list of three financing institutions from which one is chosen by the purchaser;
2) the automobile dealer submits the prospective purchaser's credit application to that financing institution;
3) after the financing institution approves the credit application the dealer sells the automobile to the purchaser; and
4) the automobile dealer assigns the contract to the financing institution and receives a fee therefor.
In the instant actions neither did the finance companies supply the subject notes, nor were the promissory notes executed after a finance company approved the credit application.
Kriger v. European Health Spa, Inc., 363 F.Supp. 334 (E.D.Wisc.1973), is factually similar to the instant actions. In Kriger the Court granted plaintiff's motion for summary judgment. Defendants included health spas that sold memberships on a unitary cash and installment price basis. Of the seventeen hundred forty promissory notes executed by members and tendered by the spas, the defendant bank purchased fifteen hundred forty at a constant sixteen per cent discount. Sixty notes were repurchased by the spas pursuant to previous agreement. This agreement did not require the bank to purchase any notes. Thirty-five customers or members paid cash for the memberships. The installment contract recited that no finance charge was imposed and that the annual percentage rate was "0%". The Court ruled that the correct finance charge was the difference between the "discount obtaining in the arrangement between" the spas and the bank (16% of face value of contract) and that the cash price was the amount received by the spas from the bank in consideration for the assignment of the notes. The Court noted that the spas tendered 100% of the notes to the bank, that 88% of them were accepted, that none of the remaining were discounted to another financial institution, that the discount rate remained unchanged throughout, and that the bank, after examining the members' credit references, had the final choice of accepting or rejecting a note. Upon these facts the Court ruled that the bank was a creditor liable under TILA. For the reasons given below I respectfully disagree with the Court's ultimate holding.
I do not disagree with the holding that the 16% discount from the price paid to the spas by the bank for the notes was a finance charge, as defined by TILA, since this discount never changed. Furthermore, there may well have been a finance charge hidden in the unitary price system.
However, under TILA, before the 1974 amendment, I believe that temporally concurrent with the liability for the failure to make the required disclosures is the opportunity to make the required disclosures in a context in which there is a contractual obligation binding on the finance company. In Kriger this element *792 is missing where the Court acknowledges that the bank was under no contractual obligation to purchase the subject notes. 363 F.Supp. at 335. This I believe is the meaning of those provisions of the definition of "arrange for the extension of credit", Reg. Z 226.2(f), relating to "credit which is or will be extended . . . under a business or other relationship . . .", and the requirement of TILA § 1638(b) and Regulation Z § 226.8(a) that the disclosures be made "before the credit is extended" and "before the transaction is consummated", respectively. My holding does not mean "no one could be held to account as a `creditor' within the meaning of the act because there would be no creditor until after the debtor has signed his contract". Garza, supra, 347 F.Supp. at 964. Rather, I hold, under the instant facts, that a specific finance company is not a "creditor" under TILA at the time the note is executed and delivered to the health club, where there is no relationship between it and the health club that calls for a conclusion that the finance company is participating in the specific transaction. Cf., Mirabal v. General Motors Acceptance Corporation (N.D.Ill., No. 71 C 3134, filed October 1, 1974).
In Glaire v. La Lanne-Paris Health Spa, Inc., Cal., 117 Cal.Rptr. 541, 528 P. 2d 357 (filed December 2, 1974), rev'ing, Cal.App., 112 Cal.Rptr. 572 (1974), the Supreme Court of California found such a relationship sufficiently pleaded to overcome a motion to dismiss. Therein plaintiff pleaded that there existed a continuing business relationship, interlocking or common corporate ownership and control, and a customary practice of systematically discounting chattel paper, between the health club and the finance company. Missing from the instant actions is the element of interlocking or common corporate ownership and control between the health clubs and Boston or Consolidated.
Plaintiffs seek to hold the finance companies liable as assignees of the notes pursuant to TILA § 1641[9]. The Court agrees with the holding of Garza, that the "assignee" language of § 1641 reflects an implied cause of action that gives meaning to plaintiff's "conduit" theory of liability. 347 F.Supp. at 964. However, I conclude that where the "conduit" theory fails due to lack of a sufficient relationship between the health clubs and the finance companies when the notes were executed by the plaintiffs, the mere assignee status of the finance companies is an insufficient basis for liability.
In conclusion, the Court concludes that the health clubs are liable to the plaintiffs and the classes they represent but that no defendant finance company is so liable. It will be so ordered.
NOTES
[1] Hereinafter, section references to "TILA" will be to Title 15 of the United States Code.
[2] Hereinafter, section references to "Regulation Z" will be to Title 12 of the Code of Federal Regulations.
[3] Plaintiffs' attorney has advised the Court that plaintiff Lynn Joseph has married and has thereby changed her name. However, no amendment of the pleadings has yet been made reflecting this fact.
[4] A member could also charge his payment on a Mastercharge credit card for $360.00.
[5] Earlier, some promissory notes were used that called for more than twenty-four installment payments. These notes were discontinued when payment thereon was found to be too difficult to enforce by collection.
[6] On October 28, 1974, certain amendments to TILA became effective pursuant to P.L. 93-495. Among the topics affected by these amendments are the liability of assignees and the amounts of recoverable civil damages. These amendments are inapplicable to these actions since the actions were tried before the effective date of the amendments.
[7] Regulation Z § 226.2(m) provides as follows:

"Creditor" means a person who in the ordinary course of business regularly extends or arranges for the extension of consumer credit, or offers to extend or arrange for the extension of such credit.
[8] Regulation Z § 226.8(a) provides in part:

All of the disclosures shall be made together on either (1) The note or other instrument evidencing the obligation on the same side of the page and above or adjacent to the place for the customer's signature; or
(2) One side of a separate statement which identifies the transaction.
[9] TILA § 1641 provided as follows:

Except as provided in section 1635(c) of this title and except in the case of actions brought under section 1640(d) of this title, in any action or proceeding by or against any subsequent assignee of the original creditor without knowledge to the contrary by the assignee when he acquires the obligation, written acknowledgment of receipt by a person to whom a statement is required to be given pursuant to this subchapter shall be conclusive proof of the delivery thereof and, unless the violation is apparent on the face of the statement, of compliance with this part. This section does not affect the rights of the obligor in any action against the original creditor.