Ella YAZZIE et al., Plaintiffs-Appellants,

v.

Gerald REYNOLDS, d/b/a Ben's Auto Sales, Defendant-Appellee.

No. 78–2012.

United States Court of Appeals, Tenth Circuit.

May 6, 1980.

Decided June 12, 1980.

Richard H. Levin, Window Rock, Ariz., for plaintiffs-appellants.

Richard B. Addis, Albuquerque, N. M., for defendant-appellee.

Before SETH, Chief Judge, and BREIT-ENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In this federal Truth-in-Lending Act case, 15 U.S.C. § 1601, *et seq.*, the plaintiffs-appellants seek reversal of an order of the United States District Court of the District of New Mexico. The cause was disposed of on summary judgment.

Each of the plaintiffs-appellants is a person who purchased a used motor vehicle from the defendant Reynolds on an installment payment basis. The prayer in each case is for statutory damages, reasonable attorney's fees and costs, and is based on alleged violations by Reynolds, d/b/a Ben's Auto Sales, in Gallup, New Mexico. The claim is that Reynolds violated the Truth-in-Lending Act and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 *et seq.* The crux of the claim is that Reynolds failed to disclose a finance charge and to express it as an annual percentage rate when, in fact, the allegation is, a finance charge was imposed on credit customers. It is further alleged that Reynolds used language which contradicted and obscured the information required by the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226.6(c).

There is no dispute about the facts:

Reynolds, who does business in Gallup, New Mexico, as Ben's Auto Sales, was engaged in retail sale of used cars. 98% of his sales were pursuant to installment contracts which provided for four or more payments payable on a prearranged schedule. The same printed-form contract was used in all of his sales transactions. Included in each contract was the following statement:

> Buyer . . . having been quoted both a time sale price and a lesser cash price hereby purchased from Seller on a time price basis . . . the following property. . . .

The actual transaction was different from this description. At no time did Reynolds quote to the plaintiffs-purchasers two different prices. In fact, the prices quoted as the "cash price" and the "deferred payment price" in the contracts were the same. Reynolds did not quote or charge any of his customers different prices according to the payment terms. Each of the present contracts disclosed the finance charge and the annual percentage rate as zero.

Thus, an express statement regarding interest or financing charge was studiously avoided. The practice was that the price was the same regardless of whether the buyer agreed to pay cash or to pay for the car in installments. Furthermore, Reynolds, according to the stipulated facts, did not sell the contracts at a discount to any other individual or financing institution. There were, nevertheless, expenses in collecting delinquent payments and repossessing automobiles. According to the evidence, this service was performed by Reynolds' salesmen. They were given notice at the outset of their employment that they would be, from time to time, required to make collections or repossessions and they did so. Reynolds would sometimes furnish an automobile for the purpose of performing this service. The salesmen would make the collections and sometimes would repossess the vehicle by connecting it to the salesman's car through the use of a towing bar.

The trial court ruled that there had been a failure to prove that Reynolds' automobiles were artificially priced so as to hide finance charges, or that there were any real differences between the cash price and the deferred payment price. The court found also that the evidence failed to establish the existence of hidden finance charges and that the contract language was not confusing. Each of the transactions was negotiated face-to-face by the plaintiffs with the salesmen, and the agreed price was in accordance with an oral agreement. The trial court determined that costs incurred by Reynolds for extension of credit were part of his regular business expenses; that these are not in any way reflected in the price which he charged installment customers.

The important issue in the case is whether this single-price sales approach was intended to and did conceal the cost of credit so as to circumvent the Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* and 12 C.F.R. § 226.4.

The suit is on behalf of five plaintiffs, Ella Yazzie, Albert Sliver, Mary Keyonnie, Alice Mary Begay and Adella T. Benally. The several cases do not differ one from the other on facts or issues. The same printed-form contract was used in each sale to the several plaintiffs. Each contract contained the following statement:

Buyer . . . having been quoted both a time sale price and a lesser cash price hereby purchased from Seller on a time price basis . . . the following property. . . .

Contrary to this language, the contract provided under the heading of "Finance Charge" and "Annual Percentage Rate" a zero. Also, each contract contained a space labeled "cash price" and another space stating "Deferred Payment Price." On each contract the appellee disclosed the "Deferred Payment Price" as an amount equal to the "Cash Price."

A flat fee was paid to the collector (salesman) for each credit payment which he successfully collected. On some occasions Reynolds would employ persons other than the salesmen to make the collections. Here again, a flat fee for each delinquent payment collected was given. There were also expenses from use of an automobile in bringing about the collection.

More than 50% of Ben's Auto Sales' customers were residents of the Navajo Indian Reservation. The vehicle of Albert Sliver which was repossessed at Ganado, Arizona, was located some 40 miles from the used car lot. An attempt was made to repossess the vehicle of Alice Mary Begay from Window Rock, Arizona. This was 26 miles from Reynolds' place of business. Appellant Mary Keyonnie ceased payment to Ben's Auto Sales on her vehicle after it was wrecked in an accident. Reynolds abandoned this car due to its condition and because of storage charges.

When he repossessed a vehicle, Reynolds would send a form letter to the delinquent credit buyer informing him or her of the repossession and of the amount required to reclaim the vehicle. The period during which plaintiffs' purchases were made, Ben's Auto Sales lost money as a result of amounts unpaid by credit buyers.

\* \* \* \* \* \*

The various sections of the Truth-in-Lending Act require the amount of the finance charge "imposed directly or indirectly by the creditor as an incident to the extension of credit" to be determined by including any of the following:

(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

(2) Service or carrying charge.

(3) Loan fee, finder's fee, or similar charge.

(4) Fee for an investigation or credit report.

(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

15 U.S.C. § 1605(a).

Regulation Z defines the items which are set forth in Section 1605 in somewhat greater detail. Thus, Regulation Z, for all practical purposes, follows the more general provisions contained in the statute. Both the statutory provision and the regulation reveal the purpose of the statute, which is identification and disclosure of the charges associated with financing the transaction.

Plaintiffs contend:

1. That a finance charge under the statute is imposed on credit buyers where the creditor has an insignificant percentage of cash sales and incurs substantial costs in connection with the extension of credit.

2. That the trial court failed to give effect to the inferences as to finance charges which are to be drawn from the basic facts.

3. That the language of the contract contradicts the disclosures required by the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*, and violates Regulation Z, 12 C.F.R. § 226.6(c).

4. That actual damages need not be proven in order for a buyer to recover.

■ Finance charges within the meaning of the Act are, as we have noted above, all charges payable by the person to whom the credit is extended, and charges "imposed directly or indirectly by the creditor as an incident to the extension of credit . ." 15 U.S.C. § 1605. The obvious object is to prevent hidden, undisclosed costs whereby

the credit buyer is unable to know the identity of the credit items. If any such finance items were added to the cost of the automobile and charged the buyer, it is essential that they be disclosed to the buyer in order that he or she can make informed decisions. In other words, the defendant was required to disclose any sums of money which stemmed from the credit transaction. The automobiles which were sold were not expensive, but the number of payments were in excess of four. The same pattern was present in every instance. Also, the evidence established that 98% of the sales made by the defendant provided for payment in more than four installments, and that there were necessarily costs which grew out of this way of doing business. Books had to be kept on the status of each sale, receipts had to be given when payments were made, and fees were paid for collection of delinquent payments in nearly all of the instances in which there was a time contract. Defendant had a vehicle used for collections and repossessions with a tow bar. Furthermore, he suffered losses on account of unpaid and uncollected bills. The cash customers were charged the same amount as the credit customers, but credit customers necessarily required added expenditure, particularly those customers that required trips to relatively distant towns for the purpose of making the collection or repossessing the vehicle. It is not difficult to infer from the record before us that the purchase price to the credit customer, at least some part of it, was used to defray the costs of collection or repossession, or both.

*Kriger v. European Health Spa, Inc., of Milwaukee, Wis.*, 363 F.Supp. 334 (E.D.Wis. 1973), is not dissimilar from the instant case. It was a truth-in-lending case which involved the cash price of membership in a health spa, but here the notes given were discounted by a bank which paid the balance to the spa. The difference between the note and the note as discounted was held to be a finance charge. The court held that the discounted amount was a credit charge to finance the transaction solely for the extension of credit, and that the defendants' argument that there was not a "finance charge" for the reason that all parties agree that the notes were for a "unitary price," regardless of whether a membership purchaser paid a lump sum or executed a promissory note or installment contract was unconvincing. The court cited *Strompolos v. Premium Readers Service*, 326 F.Supp. 1100, 1103 (N.D.Ill.1971); *Joseph v. Norman's Health Club, Inc.*, 336 F.Supp. 307 (E.D.Mo.1971), and *Garza v. Chicago Health Clubs, Inc.*, 347 F.Supp. 955, 964 (N.D.Ill.1972). The court concluded that the unitary price which was adopted by the European Health Spa "served no function other than that of concealing the real cost of credit." 363 F.Supp. at 337. The cash price was nothing more than theoretical. The fact that only 35 out of 1775 customers during the time in question paid cash provided cogent support for the belief that the defendants did not expect to sell their services on that basis and that the "unitary price" was but a marketing tool designed to convince the customer that he was getting a free extension of credit.

Also discussed in the *Kriger* opinion is the decision of the Supreme Court in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The basic issue in that case was whether or not the Federal Reserve Board had exceeded its authority in promulgating Regulation Z and, especially, the "four-installment rule." The respondent's door-to-door salesmen had called on a poor widow residing in Florida, and sold her a five-year subscription to four magazines. She agreed to pay $3.95 immediately and to remit a similar amount monthly for 30 months. There was a clause in the contract stating that the subscriptions could not be canceled and an acceleration provision providing that any default in installment payments would render the balance due immediately. The total purchase price was not stated nor did the contract state the amount remaining unpaid after the initial payment. Also, there was no mention made of the service or finance charge. The petitioner made the initial payment, but soon thereafter defaulted, whereupon respondent declared the

entire balance due and threatened to bring an action. Subsequently, a suit was indeed started in the United States District Court. It was alleged in the action that the respondent had failed to comply with the disclosure provisions of the Truth-in-Lending Act. Recovery of the statutory penalty plus costs, including attorney's fees, was sought.

In *Mourning*, the price was the same whether it was remitted in cash or in payments. The evidence, however, showed that in some cases customers agreed to pay the entire contract price at a price less than the aggregate amount of the installments. The district court granted relief, giving the petitioner (plaintiff) a summary judgment. The Court of Appeals reversed, saying that the Federal Reserve Board had "exceeded its statutory authority in promulgating the regulation upon which the District Court relied," because that regulation was in conflict with § 121 of the Act in that it required disclosure in regard to credit transactions in which a finance charge had not been imposed. In the course of the opinion by the Chief Justice, it was pointed out that the ultimate purpose of Congress in enacting the Truth-in-Lending Act was to give to the consumer information whereby he or she could compare the cost of credit and make an informed judgment as to the use of the credit. In other words, it was an effort to bring about an informed use of credit. The Court recognized that credit occurred in myriad forms, and for that reason the structure of the Act was broadly laid; that the language was such as to evidence an awareness by Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. The Act also indicated "the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to 'carry out the purposes' of the Act, Congress specifically provided, as noted earlier, that the regulations may define classifications and exceptions to insure compliance with the Act." 411 U.S. at 365, 93 S.Ct. at 1658–59. The Court said that one means of avoiding the objectives of the Act as passed by Congress was to bury the cost of the credit in the cost of goods sold. "Thus in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction." 411 U.S. at 366, 93 S.Ct. at 1659. The Court said that Congress was fully aware of the practices and devices used to evade the disclosure requirements of the Act. The Supreme Court went on to hold that the four-installment rule was well within the purpose that Congress had in preventing avoidance of the Act.

A partial dissent by Justice Douglas, concurred in by Justices Stewart and Rehnquist, concluded that the case was not one for summary judgment and that the district court erred in granting the summary judgment to the plaintiff-petitioner. The judgment was reversed and it was remanded with directions to vacate the summary judgment that had been entered even in the absence of imposing evidence. About all that was cited as evidence that a credit transaction existed was the fact that the respondent had sent petitioner Mourning a letter reminding her that the seller had ordered the magazine in advance and the buyer had incurred an obligation to pay and that "this is a credit account and as such must be repaid by you on a monthly basis." The opinion of Justice Douglas stated that this was not a conclusive admission and that was why it could not be determined on summary judgment.

For the purpose of this case, the *Mourning* decision operates to bring the claims of the several plaintiffs as against the defendant within the provisions of the Act in that the Supreme Court approved the four-installment test or standard. It also recognized the broad purposes that Congress was seeking to achieve in requiring the disclosure of the various aspects of

credit transactions which require disclosure. In the light of the Act, a single price for both cash and credit transactions, notwithstanding that the vast portion of the business of the defendant-appellee involved installment payments which are costly, tends to show that the defendant is seeking to avoid the requirements of the Truth-in-Lending Act. In other words, the evidence in the case raises at least a factual issue as to whether these transactions are a ploy which has been designed to avoid the Truth-in-Lending Act.

\* \* \* \* \* \*

■ Notwithstanding the above comments, our present holding is limited to the legal effect of the court's summary judgment ruling in favor of the defendant. We are of the opinion that the record did not justify the trial court's conclusion that the defendant was entitled to summary judgment against these plaintiffs. The conclusion that there are no questions of fact and that the questions of law favor the defendant disregards the objects and purposes of the Act and the particular facts which have been set forth and recounted above. There are basic facts which give rise to inferences that the contracts in issue seek to disguise the real nature of the contracts as being credit transactions which seek to avoid the intricacies of the Truth-in-Lending Act. Moreover, there are facts which establish that substantial expenditures were made in servicing the installment contracts. These expenditures were, of course, not revealed and the trial judge should consider the questions which are thereby raised.

The defendant argues that he lost money on these installment contracts. It may be that he went to so much trouble in his efforts to avoid the Act that he did not get compensated for legitimate demands. The fact, however, that he made money or lost money is not the question before us. The issue is whether he violated the Truth-in-Lending Act by concealment of the facts.

These, then, are the issues with which the trial court must come to grips in reassessing the case.

The judgment of the district court must, then, be reversed and the cause must be remanded for further proceedings consistent with the expressions contained herein.