[L.A. No. 30315. In Bank. Dec. 2, 1974.]

LINDA L. GLAIRE, Plaintiff and Appellant, v.
LA LANNE-PARIS HEALTH SPA, INC., et al.,
Defendants and Respondents.

COUNSEL

Palley & Schwartz and Michael R. Palley for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Oliver F. Green, Jr., and Geoffrey L. Thomas for Defendants and Respondents.

OPINION

**MOSK, J.**—On behalf of herself and others similarly situated, plaintiff Linda L. Glaire brought a class action against defendants La Lanne-Paris Health Spa, Inc., hereinafter "La Lanne," and Universal Guardian Acceptance Corporation, hereinafter "Universal," together with other named health clubs and finance companies.[1] The complaint charged defendants with violating that portion of the Consumer Credit Protection Act commonly known as "Truth-in-Lending" (15 U.S.C. § 1601 et seq.) and with

---

[1] For convenience and in accordance with the tenor of the complaint, throughout this opinion the conduct of La Lanne and Universal will be considered representative of the commercial practices of the other named defendants.

exacting interest in excess of the legal rate prescribed in article XX, section 22, of the California Constitution. Based upon these allegations, but as separate and further causes of action, plaintiff also sought declaratory relief to define the rights of members of the class under existing consumer contracts with defendants and injunctive relief to prevent the formulation of similar such contracts in the future. Defendants successfully filed general demurrers to each of the alleged causes and a judgment of dismissal was entered thereon from which plaintiff now appeals. We conclude the trial court erred in sustaining the demurrers and therefore reverse the judgment.

Our only concern in this case is whether plaintiff has succeeded in stating a cause of action. ■ In assessing the sufficiency of a complaint against a general demurrer, we must treat the demurrer as admitting all material facts properly pleaded. (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137]; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) Furthermore, we bear in mind our well established policy of liberality in reviewing a demurrer sustained without leave to amend: "the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties." (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 244-245 [74 Cal.Rptr. 398, 449 P.2d 462]; see also *Scott* v. *City of Indian Wells* (1972) *supra; MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 542 [343 P.2d 36]; *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 664 [297 P.2d 638]; *Matteson* v. *Wagoner* (1905) 147 Cal. 739, 742 [82 P. 436]; Code Civ. Proc., § 452.)

From the complaint the following facts emerge. Plaintiff, whose posture typifies that of her class, purchased a seven-year membership in a health club owned and operated by La Lanne. The price of the membership was $408, regardless of whether the sum was paid in cash at the outset or paid over a two-year period in monthly installments of $17 each. Plaintiff elected to pay over time, as do most of La Lanne's customers, and accordingly entered into a standard form contract which declared that no "service charge" was made for the extension of credit and provided that any default in installment payments would render the entire balance due. As a matter of course in its business practice, La Lanne thereupon sold plaintiff's contract to Universal at a discount of 37.5 percent. La Lanne thus immediately received $255 in cash and plaintiff became obligated to Universal for the full $408 payable over two years. La Lanne and Universal are interlocking corporations with common ownership and control, and Universal regularly assists La Lanne in its financing by accepting chattel paper at a discount.

Plaintiff's principal allegation is that La Lanne and Universal failed to comply with certain provisions of the federal Truth-in-Lending legislation. Truth-in-Lending was enacted in 1968 to supply a measure of uniformity to "the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the credit extended to them." (*Mourning* v. *Family Publications Service, Inc.* (1973) 411 U.S. 356, 363 [36 L.Ed.2d 318, 326, 93 S.Ct. 1652]; see also H.R. Rep. No. 1040, 90th Cong., 1st Sess. (1967); Sen. Rep. No. 392, 90th Cong., 1st Sess. (1967).) Its purpose is explicit in the act: "The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit." (15 U.S.C. § 1601.)

In order to encourage the informed use of credit, Truth-in-Lending requires merchants who regularly extend credit to disclose to each consumer certain information relevant to the cost of deferring payment. (15 U.S.C. §§ 1602, 1631.) Among other facts, a merchant must, prior to consummating a sale, conspicuously indicate the cash price, the total amount deferred, the finance and other charges, and the annual percentage rate of interest. (15 U.S.C. § 1638.) Failure to so disclose may result in civil liability to the consumer for a penalty of twice the amount of the finance charge, though not less than $100 nor more than $1,000, and for the costs of the litigation including reasonable attorney's fees. (15 U.S.C. § 1640.)

The terms of Truth-in-Lending are necessarily broad. In debating its coverage, Congress fully recognized that "[w]hatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future." (*Mourning* v. *Family Publications Service, Inc.* (1973) *supra,* 411 U.S. 356, 365 [36 L.Ed.2d 318, 327].) Accordingly, in order to compel the meaningful disclosure of credit information in the extensive variety of consumer transactions and to discourage deceptive practices designed to circumvent the purposes of Truth-in-Lending, Congress delegated wide authority to the Federal Reserve Board to interpret the act's provisions and to promulgate such regulations as may be deemed necessary to preserve the act's effectiveness. (15 U.S.C. § 1604.)

On its face, Truth-in-Lending compels the disclosure of contract information only in those credit transactions "for which the payment of a finance charge is required." (15 U.S.C. § 1602 (f).) It is not surprising, therefore, that soon after the passage of the act there began to appear various sales techniques by which merchants attempted to evade the demands of Truth-in-Lending by claiming no finance charge was imposed for a particular installment sale. The most common of these methods was the practice of "burying" the cost of credit in the price of the merchandise sold. In this way, a creditor might cease to admit a finance charge, but instead inflate the purported cash price in order to recoup the cost of deferred payment.[2] The practice of burying the cost of credit in an inflated cash price strikes hardest at the consumer who is dependent upon making purchases on credit: it is meaningless for such a consumer to compare other cash prices which do not include "free" credit. Conversely, when a merchant operates primarily on a credit basis, he is little concerned with quoting prices attractive to a cash buyer and it is largely irrelevant to him and his customers how the total price is allocated between actual cash price and credit charge. (See Warren & Larmore, *Truth in Lending: Problems of Coverage* (1972) 24 Stan.L.Rev. 793, 817.)

To ease the problem of buried finance charges, the Federal Reserve Board, pursuant to its delegated powers, adopted the "Four Installment Rule" as part of a series of Truth-in-Lending regulations collected under the designation "Regulation Z." (12 C.F.R. § 226.) Under that rule, the coverage of Truth-in-Lending is extended to all credit transactions "for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." (12 C.F.R. § 226.2 (k).) The Four Installment Rule thus removes much of the incentive to bury credit charges inasmuch as the rule brings within the ambit of the act all consumer obligations which are payable in more than four installments. Even under that rule a creditor may not be forced to "break out," i.e., identify, a finance charge if he insists none exists; yet the consumer is nonetheless assured the disclosure of other useful information regarding the number, dates, and amounts of payments,

---

[2] For example, two merchants might pay a wholesale price of $50 to purchase radios which normally sell for $75 retail. One might then sell a radio to a consumer for a price of $70 plus a finance charge of $25 to cover the cost of extending credit over a one-year period. The other, however, might sell the same radio for a price of $100 payable over a one-year period and claim that credit was extended free and that Truth-in-Lending is not applicable. This second merchant may be said to have buried the finance charge. In either case, it is obvious that the $25 discrepancy between the actual gross purchase price and the normal purchase price represents a charge for the extension of credit.

insurance costs, balloon payments, and default provisions, and he is afforded the general advertising safeguards of the act. (See *Mourning* v. *Family Publications Service, Inc.* (1973) *supra,* 411 U.S. 356, 369, 377 [36 L.Ed.2d 318, 329-330, 334]; 15 U.S.C. §§ 1638 (a), 1661-1665.) As has been suggested, a consumer who is particularly dependent upon credit may be more concerned with such other information than with the existence and amount of any finance charges. (See Warren & Larmore, *Truth in Lending: Problems of Coverage* (1972) 24 Stan.L.Rev. 793, 817.)

In her complaint, plaintiff alleged that regardless of whether a finance charge was in fact imposed, La Lanne failed to make certain disclosures required under the Four Installment Rule. Although the rule plainly applies to the transaction at hand, the trial court sustained defendant's demurrer to the cause on the basis of a decision by the United States Court of Appeals which held the Four Installment Rule to be an unconstitutional conclusive presumption of a finance charge in violation of due process and to be a regulation in excess of the Federal Reserve Board's delegated authority. (*Mourning* v. *Family Publications Service, Inc.* (5th Cir. 1971) 449 F.2d 235.) Since that time, however, the United States Supreme Court has reversed the circuit court decision in *Mourning* and has affirmed the validity of the Four Installment Rule. (*Mourning* v. *Family Publications Service, Inc.* (1973) *supra,* 411 U.S. 356.) As a result, the trial court's ruling on this point cannot stand: plaintiff has raised a justiciable question of fact as to whether La Lanne satisfactorily complied with the disclosure responsibilities triggered by the Four Installment Rule.

The Four Installment Rule "was intended as a prophylactic measure; it does not presume that all creditors who are within its ambit assess finance charges, but, rather, imposes a disclosure requirement on all members of a defined class in order to discourage evasion by a substantial portion of that class." (*Mourning* v. *Family Publications Service, Inc.* (1973) *supra,* 411 U.S. 356, 377 [36 L.Ed.2d 318, 334].) In addition to relying on the Four Installment Rule, however, plaintiff also contended in her complaint that defendants' cooperative method of financing consumer contracts was designed to conceal the imposition of actual finance charges which are properly subject to disclosure under Truth-in-Lending.

Truth-in-Lending requires disclosures by only those merchants who satisfy the statutory meaning of the term "creditor." (15 U.S.C. § 1631 (a).) That term is defined in the act to include "creditors who regularly extend, or arrange for the extension of, credit for which the payment of a finance charge is required, whether in connection with loans, sales

of property or services, or otherwise." (15 U.S.C. § 1602 (f). Thus, the act contemplates the coverage of two types of creditors, so-called "extenders" and "arrangers," and imposes disclosure responsibilities on both in three-party transactions in which a seller, as a matter of course, arranges for his customers to obtain credit from a financier. The regulations elaborate on the concept of an arranger, as distinguished from an extender: " 'Arrange for the extension of credit' means to provide or offer to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the credit terms and participates in the preparation of the contract documents required in connection with the extension of credit." (12 C.F.R. § 226.2 (f).)

Except to the extent required under the Four Installment Rule, neither extenders nor arrangers of credit are compelled to make disclosures under Truth-in-Lending unless the payment of a finance charge is exacted. (15 U.S.C. § 1602 (f).) The term "finance charge" is defined in the act as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit, including . . . (1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges . . . ." (15 U.S.C. § 1605 (a).) The regulations repeat the statutory definition, but add that a finance charge is to be considered such "whether paid or payable by the customer, the seller, or any other person on behalf of the customer to the creditor or to a third party . . . ." (12 C.F.R. § 226.4 (a).)

Plaintiff's theory is that because of the continuing business relationship and interlocking ownership of La Lanne and Universal and because of La Lanne's customary practice of systematically discounting its chattel paper to Universal, La Lanne qualifies as an arranger of credit under Truth-in-Lending and Universal in fact extends the credit. According to plaintiff, La Lanne's practice of offering to its customers unitary price contracts, i.e., contracts in which the price payable in cash at the outset would equal the sum to be paid in installments over time, is merely a device to conceal the actual cost of credit to the consumer, which corresponds to the amount of the discount La Lanne regularly allows to Universal. Thus, when La Lanne charges $408 to be paid in installments, it in fact receives only $255 for its services, with Universal ultimately recouping the $255 which it paid at once to La Lanne for the contract and gaining an additional $153 in return for the risk of permitting the consumer to pay over time. It is this differential of $153 between the amount La Lanne receives

and the amount the consumer pays for La Lanne's services which plaintiff claims to constitute a finance charge for the extension of credit which must be disclosed under Truth-in-Lending.

Three recent federal court decisions have upheld contentions virtually identical to those advanced by plaintiff in circumstances remarkably similar to the case at bar. (*Kriger* v. *European Health Spa, Inc., of Milwaukee, Wis.* (E.D.Wis. 1973) 363 F.Supp. 334; *Garza* v. *Chicago Health Clubs, Inc.* (N.D.Ill. 1972) 347 F.Supp. 955; *Joseph* v. *Norman's Health Club, Inc.* (E.D.Mo. 1971) 336 F.Supp. 307.) In each case the plaintiff and others similarly situated entered into a contract to pay a net sum in installments in return for the right to use certain health club facilities. As in the case before us, the contracts were promptly sold to finance companies at a standard and substantial discount.

In two of the cases, *Joseph* and *Garza,* the court refused to grant defense motions for summary judgment on a theory either that third-party finance companies have no disclosure responsibilities under Truth-in-Lending or that unitary price contracts contain no finance charge as a matter of law. In *Garza,* the court acknowledged that the theory of recovery relied upon by plaintiff in the present case constitutes a proper cause of action: "assignees of consumer retail installment contracts who regularly extend or arrange for the extension of credit to consumers through the assignors of such contracts may themselves be 'creditors' within the meaning of, and subject to liability under, Truth in Lending. To put it another way, lenders may not escape TIL status as creditors by using sales companies as 'front men.'" (347 F.Supp. at p. 964; see also *Joseph* v. *Norman's Health Club, Inc.* (E.D.Mo. 1971) *supra,* 336 F.Supp. 307, 318.) In *Joseph,* the court emphasized that whether the systematic practice of discounting chattel paper operated as a subterfuge to impermissibly conceal a finance charge in violation of Truth-in-Lending was a question of fact for determination at trial: "since plaintiffs have alleged that a finance charge was in fact included in the face amount of the notes, and defendants contend that no finance charge was imposed, a material fact is in dispute and summary judgment is inappropriate." (336 F.Supp. at p. 318.)

In *Kriger,* with *Joseph* and *Garza* before it, the court went even further. The facts in that case closely parallel those at bar: there a health spa offered to its customers unitary price contracts which it customarily tendered to one bank at a fixed discount; the contracts disclosed no finance charge and no rebate was provided in the event of acceleration or voluntary prepayment. In measuring the scheme against the yardstick of Truth-in-Lending, the court found that the health spa was acting merely as a

conduit for the consumer credit extended by the bank and that correct disclosures would have reflected as a finance charge the amount of the discount between the spa and the bank. Based on these findings, the court not only denied defense motions for summary judgment but granted summary judgment in favor of the plaintiff consumers. (For a comparable result see *Killings* v. *Jeff's Motors, Inc.* (5th Cir. 1974) 490 F.2d 865.)

In reaching its conclusion, the court in *Kriger* agreed with *Garza* that finance companies cannot avoid Truth-in-Lending responsibilities for transactions in which they regularly participate merely by remaining behind the scenes and accepting consumer contracts only after the initial sales have been consummated (363 F.Supp. at p. 336.) The court also agreed with *Joseph* that the systematic discounting of unitary price contracts may operate to conceal an actual charge for credit in the amount of the discount (*id.* at pp. 336-337), and in so holding cited the earlier decision of *Strompolos* v. *Premium Readers Service* (N.D.Ill. 1971) 326 F.Supp. 1100, 1103, which considered the problem of buried finance charges: "Merely because a so-called 'cash' price is the same as for a thirty installment repayment plan does not indicate that the 'cash' price does not include substantial financing charges in a very real sense . . . . [¶] Neither the law, the Federal Reserve Board nor the courts are so simplistic as to believe that a person in the business of extending long term credit should be permitted to abolish the Truth in Lending Act by merely charging a single 'cash or credit' price knowing full well that the great bulk of its customers will never pay in less than, for example, thirty months."

We find persuasive the logic and analysis of these federal decisions. According to the complaint, Universal accepts the vast majority of La Lanne's installment contracts at a fixed discount contemporaneously with their execution. Universal's practice of accepting such contracts is functionally equivalent to extending loans directly to La Lanne's customers at a defined rate of interest: in either case, La Lanne receives a net cash sum and the customer becomes obligated to Universal for a greater amount which includes a charge for the credit risk assumed by Universal. Nevertheless, by employing this method of systematic discounting Universal purports to evade all liability under Truth-in-Lending, whereas a direct loan would be clearly covered under the act.

We have held in closely analogous consumer contexts that a finance company cannot shed the duties and responsibilities of a lender by accepting the assignment of contracts from a seller with which it is intimately connected. (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 822 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Morgan* v. *Reasor Corp.*

(1968) 69 Cal.2d 881, 894 [73 Cal.Rptr. 398, 447 P.2d 638]; *Com. Credit Corp.* v. *Orange Co. Mach. Works* (1950) 34 Cal.2d 766, 771 [241 P.2d 819]; see also *Unico* v. *Owen* (1967) 50 N.J. 101 [232 A.2d 405, 417].) In such cases, we treat the finance company as though it were a party to the original transaction. So too under Truth-in-Lending we must look to the substance of the transaction and not allow mere form to dictate the result. Where, as appears here, a finance company assumes so close a relationship with a seller that it becomes an integral part of the seller's financing program, the finance company must bear full responsibility for all disclosures required under Truth-in-Lending. Thus there comes a point at which, because of its continual dealings with a particular seller, a finance company may be viewed directly as the extender of consumer credit which the seller has merely arranged. (15 U.S.C. § 1602 (f); 12 C.F.R. § 226.2 (f).)

In so holding, we do not, as Universal protests, extend the coverage of the act to commercial credit, which is explicitly exempted from Truth-in-Lending. (15 U.S.C. § 1603; 12 C.F.R. § 226.3 (a).) Our concern is not the sale of contracts between two commercial entities, La Lanne and Universal, but the fact that such a method of operation may serve to channel credit directly from Universal to the consumer with La Lanne acting merely as a conduit. Furthermore, we cannot accept Universal's contention that assignees of installment contracts should not be considered as creditors under Truth-in-Lending because the customers do not become obligated to them until the contracts are signed, i.e., subsequent to the time when disclosures are required. Under such a theory, considered and rejected in *Kriger* and *Garza*, "no one could be held to account as a 'creditor' within the meaning of the act because there would be no creditor until after the debtor signed his contract." (*Garza* y. *Chicago Health Clubs, Inc.* (N.D.Ill. 1972) *supra*, 347 F.Supp. 955, 964.)

The Four Installment Rule, by excusing the disclosure of a finance charge, recognizes that in many transactions involving consumer credit we cannot force the lender to break out the price of deferring payment, either because it is too cleverly disguised or because none in fact exists. (See *Mourning* v. *Family Publications Service, Inc.* (1973) *supra*, 411 U.S. 356, 377, fn. 42 [36 L.Ed.2d 318, 334].) For example, when a merchant offers his customers unitary price contracts for the purchase of goods which he holds and collects upon himself, we cannot estimate with any degree of certainty what portion of the contract price constitutes a charge for the extension of credit. However, should the merchant regularly and systematically discount the contracts at a fixed rate to a third party, we may fairly say that the amount of the discount represents

a charge "payable . . . indirectly by the person to whom the credit is extended, and imposed . . . indirectly by the creditor as an incident to the extension of credit." (15 U.S.C. § 1605 (a).) Thus, in a situation in which the merchant and a finance company maintain an intimate and continuing relationship centering around the routine discounting of installment contracts, both parties acquire an obligation under Truth-in-Lending to disclose the amount of the standard discount as a finance charge payable by the consumer. (15 U.S.C. §§ 1602(f), 1605(a); 12 C.F.R. §§ 226.2 (f), 226.4 (a).)

Defendants suggest that plaintiff is in fact attacking their pricing decision not to allow their customers the opportunity to pay a lower cash price equal to the discounted value of the installment contracts, and that such pricing policy is not monitored by Truth-in-Lending. Again, the argument misses its mark. The thrust of plaintiff's complaint is not directed at coercing La Lanne into adopting a particular pricing structure, but rather at exposing a method of financing which operates to conceal the actual cost of credit to the consumer. (See *Kriger* v. *European Health Spa, Inc., of Milwaukee, Wis.* (E.D.Wis. 1973) *supra,* 363 F.Supp. 334, 337.) Similarly, it is unnecessary for plaintiff to allege that La Lanne charged a cash price lower than the credit price in order to establish the existence of a finance charge subject to disclosure. As we have seen, unitary price contracts may contain a real and substantial charge for the right to defer payment. (See *id.* at pp. 336-337; *Joseph* v. *Norman's Health Club, Inc.* (E.D.Mo. 1971) *supra,* 336 F.Supp. 307, 317-318; *Strompolos* v. *Premium Readers Service* (N.D.Ill. 1971) *supra,* 326 F.Supp. 1100, 1103.)

It follows from the foregoing analysis that plaintiff has succeeded in stating a cause of action against both La Lanne and Universal under the Four Installment Rule and more generally under Truth-in-Lending. Accordingly, the trial court erred in sustaining defendants' demurrer to the cause.

■    In her complaint, plaintiff also alleged that the customary discounting of contracts from La Lanne to Universal concealed a hidden interest charge to the consumer which exceeded the usury limitation of the California Constitution. (Art. XX, § 22.) The trial court, however, concluded as a matter of law that the practice did not involve interest and therefore could not have been usurious.

The concept of a finance charge, as set forth in Truth-in-Lending, is clearly a legislative creation: it derives its full content and substance from the statutory framework in which the term was developed. Nonetheless,

the identical process of reasoning which led us to determine that a finance charge may be buried in the method of operation employed by La Lanne and Universal compels the conclusion that such a charge may constitute interest which is subject to scrutiny under the usury clause.

Defendants urge that the practice of transferring notes at a discount cannot amount to usury regardless of the margin of profit anticipated by the buyer. In so contending, defendants rely on *Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621], in which we stated that "[c]ontractors are free to buy and sell their property, and this may include promissory notes and other instruments, at a price agreed upon, and when the bona fides of the parties is established the percentage of profit has no relation to the usury law." (See also *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 300 [98 Cal.Rptr. 547].) **(4)** But as we proceeded to observe in *Milana,* the good faith of the parties is crucial to the insulation of discount transactions from usury consideration, and good faith is ultimately a question of fact: "lenders, intent on collecting compensation for the use of money in excess of the lawful rate, seek to avoid transacting their business in the form of loans. The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance. [Citations.] . . . 'No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence, and if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings.' All of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts may be material in determining whether the form thereof covered an intent to violate the usury law . . . ." (*Id.* at pp. 340-341; see also *Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 678 [102 Cal.Rptr. 455]; *Mission Hills Dev. Corp.* v. *Western Small Business Inv. Co.* (1968) 260 Cal.App.2d 923, 926 [67 Cal.Rptr. 505].)

By sustaining the demurrer, the trial court precluded plaintiff from offering evidence to establish that defendants' practice of discounting notes in fact operated to conceal the imposition of usurious interest charges, and in so doing the court clearly erred. As we have often noted, substance not form must dictate the treatment that a transaction is to be accorded under the usury law, and the question of substance is predominantly a factual inquiry.

Plaintiff's remaining causes of action, i.e., to define the rights of members of the class under existing contracts and to prevent the execution of similar contracts in the future, are governed by the validity of the foregoing causes. Inasmuch as plaintiff has succeeded in stating causes of action under both the federal Truth-in-Lending legislation and the California usury clause, she may also, upon proper proof, receive declaratory and injunctive relief as prayed.

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Burke, J.,* concurred.

On December 26, 1974, the opinion was modified to read as printed above.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.