Marjorie JOSEPH et al., Appellants,

v.

NORMAN'S HEALTH CLUB, INC., et al., Appellees.

Barbara C. MORSE et al., Appellants,

v.

NORMAN'S HEALTH CLUB, INC., et al., Appellees.

Nos. 75–1141, 75–1142.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1975.

Decided March 5, 1976.

Rehearing and Rehearing En Banc Denied March 30, 1976.

---

Martin M. Green, St. Louis, Mo., for appellants; Martin M. Green, James A. Eidelman, Anderson, Green, Fortus & Lander, Clayton, Mo., on the briefs for appellants.

Gerald A. Rimmel and Alan E. Popkin, St. Louis, Mo., for appellees.

Gerald A. Rimmel, Susman, Schermer, Willer & Rimmel, St. Louis, Mo., for appellees Boston Securities, Inc., of Kirkwood, Boston Securities of Florissant, Boston Securities, Inc., of Moline Acres, Boston Securities, Inc., and Boston Securities Corp. of Missouri.

Alan E. Popkin and Richard C. Witzel, Rosecan, Popkin & Chervitz, St. Louis, Mo., for appellee Consolidated Finance Corp.

Before CLARK,[*] Associate Justice and LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

■ These appeals, brought by the plaintiffs in two consolidated class actions, involve the scope and application of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq. (1969). The defendants below were Norman's Health Club, Inc. (the Club) and two finance companies, Boston Securities, Inc. (Boston) and Consolidated Finance Corp. (Consolidated), to which the Club assigned promissory notes signed by the plaintiffs. The district court held the Club liable to plaintiffs for various violations of TILA disclosure requirements.[1] However, the district court found that the finance companies were not "creditors" under the Act and hence had no duty to disclose to the plaintiff class.[2] Joseph v. Norman's Health Club, Inc., 386 F.Supp. 780 (E.D.Mo.1974). The plaintiffs appeal from the judgment in favor of the defendant finance companies. We reverse this finding and remand the cause for further proceedings.

*Facts*

The facts are substantially undisputed. Between 1960 and 1971, Norman R. Saindon owned and operated a chain of health clubs in the St. Louis, Missouri area. "Lifetime memberships" were offered to the public for $360, payable in 24 equal monthly installments of $15 each. Before the Truth in Lending Act became effective, a few memberships were also sold for cash at discounts of 10 to 15 percent off the total installment price.[3] The district court found that it was the intention of the Health Club to sell almost all memberships on the installment plan and to discount all the notes to finance companies. Ninety-eight percent of club members chose to sign installment notes. 386 F.Supp. at 783.

The Club had dealt with seven or more finance companies since 1960, but by the

* Associate Justice Tom C. Clark, United States Supreme Court Retired, sitting by designation.

1. No appeal was taken by the Club from the judgment against it since it is in involuntary bankruptcy.

2. Defendant Boston Securities seeks to challenge on appeal the district court's certification of the suits as class actions on the question of liability. We need not reach this question, however, for Boston has not filed a cross-appeal.

 An appellee cannot attack a judgment either to enlarge his rights thereunder or to lessen the rights of his adversary unless he files a cross-appeal. *Tiedeman v. Chicago, Milwaukee, St.*

*Paul & Pac. R. R.*, 513 F.2d 1267, 1272 (8th Cir. 1975); *Hadfield v. Ryan Equip. Co.*, 456 F.2d 1218, 1222 (8th Cir. 1972).

3. When the Act became effective on July 1, 1969, club salesmen were instructed not to make further cash sales because the club management believed that such sales might make the club note, which stated the finance charge and annual percentage rate as zero, violative of the Act. Nevertheless, the district court found that the Club did sell at least four memberships for cash prices of less than the $360 installment price after the effective date of the Act. 386 F.Supp. at 783.

time TILA became effective, the Club was tendering all of the notes to only defendants Boston and Consolidated. The Club had negotiated an agreement with each company providing the rate of discount and other terms under which the finance companies would purchase such notes as they determined to be creditworthy. The finance companies were not required to purchase any minimum number of notes under these agreements, but they ultimately rejected only five percent.[4]

The Club's practice was to require customers purchasing a membership on the installment plan to sign a promissory note and to fill out a standard credit application form. The latter was used to provide credit information to the finance companies. Once these forms had been filled out, the Club would often notify one of the finance companies the same day. The finance company would conduct an immediate credit check on the customer and would call the customer to verify that he had signed the membership contract. If the finance company found the new member to be an acceptable credit risk, the Club would assign the note to the finance company without recourse. The finance company would pay the Club the face amount of the note less the amount of the discount provided in the agreements.

Thereafter, the finance company would treat the club member whose note it had accepted just as it treated its own direct loan customers. The finance company would send the club member a payment coupon book as well as instructions that all payments were to be made directly to the finance company and a notice that a late charge would be assessed for late payments. The club member's account was carried on Consolidated's books as a "loan" with the member described as the "customer" and the finance company as the "lender". Defendant Consolidated would notify the club

members who had made a certain number of payments that they were now preferred customers of Consolidated. Boston similarly designated club accounts as "loans".

The discount, that is, the difference between the face amount of the customer notes and the cash amount which the finance companies would pay the Club upon assignment of each customer note, was substantial. It ranged from $85 to $165 on the $360 notes. The discount rate was the same on all notes at any one time, but it was renegotiated upward from time to time.

*The District Court's Decision.*

The district court held that the installment note form violated TILA in several respects. It held that the price reduction of 10 percent or more which had been allowed the four members who paid cash after July 1, 1969 indicated that there was an undisclosed finance charge of 10 percent imposed on installment customers. The district court held that the failure to disclose this and certain other facts rendered the Health Club liable to the plaintiffs.

On the other hand, the district court found that the finance companies had not extended consumer credit and thus had no obligation to make disclosures to the class members. The court similarly found that the Club was not acting as a "conduit" for the finance companies since there was no interlocking control between the Club and the finance companies and the latter did not specifically participate in the initial loan transaction.

The plaintiffs characterize the membership transactions as, in substance, a *consumer loan* extended by the finance companies to the members, with the proceeds paid on the members' account to the Club. They urge that the discount on the note is the finance charge in the transaction. Thus, in plaintiffs' view, the Club served as a conduit for the finance companies who were the true "extenders" of consumer loans in

**4.** In 1968 the Club and Boston Securities operated under a master agreement which adopted the note form then used as the note to be negotiated with each member. When discount

rates eventually increased, the parties abandoned the master agreement, but continued to deal with one another as they had in the past.

the ordinary course of business within the meaning of TILA, and it is urged that all of the defendants are jointly liable for failure to disclose the finance charge and certain other information.

The finance companies, on the other hand, contend that the only consumer credit transaction within the intended scope of the Act was a *credit sale* by the Club to the plaintiffs. The subsequent purchase at a discount of the promissory notes by the finance companies, it is urged, was a bona fide commercial or business transaction exempted from TILA disclosure requirements until the 1974 amendments.[5]

The fundamental question is whether Congress intended the finance companies to bear some responsibility for TILA disclosures under the circumstances disclosed. We think it did.

*An Overview of the Act.*

■ The fundamental purpose of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, is to require creditors to disclose the "true" cost of consumer credit, so that consumers can make informed choices among available methods of payment. *See* 15 U.S.C. § 1601; *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 364–65, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318, 326 (1973); Warren & Larmore, *Truth in Lending: Problems of Coverage*, 24 Stan.L.Rev. 793 (1972); W. Willier & F. Hart, Consumer Credit Handbook (1969). The Act is remedial in nature.

The Act was intended to change the practices of the consumer credit industry, and the statute reflects Congress' view that this should be done by imposing disclosure requirements on those who "regularly" extend or offer to extend consumer credit.[6] In interpreting the Act, the Federal Reserve Board and the majority of courts have focused on the substance, rather than the form, of credit transactions, and have looked to the practices of the trade, the course of dealing of the parties, and the intention of the parties in addition to specific contractual obligations. Thus, in *Mourning v. Family Publications Service, Inc., supra,* the Supreme Court said:

> The hearings held by Congress reflect the difficulty of the task it sought to accomplish. Whatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future. . . .
> The language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. 411 U.S. at 365, 93 S.Ct. at 1658, 36 L.Ed.2d at 327.

The statute requires certain information, such as total finance charges and the applicable annual percentage rate, to be disclosed "to each person to whom *consumer credit is extended and upon whom a finance charge is or may be imposed.*" 15 U.S.C. § 1631(a). "Credit" includes "the right granted by a creditor to a customer to . . . incur debt and defer its pay-

---

5. *See* note 7 *infra.*

6. Systematic discounting of consumer paper plays so large a role in the consumer finance industry that Congress could not have been unaware of its importance. Indeed, as one commentator has noted:

> Because few people can afford to pay cash for consumer goods and services, and because most dealers in such goods and services are not in the business of lending money, the typical consumer-dealer transaction involves a third-party financer. *The most common method of financing the purchase of goods and services is the three-party install-*

> *ment credit sale.* Under this arrangement, when the consumer purchases goods from the dealer, he obligates himself to pay the dealer in a series of monthly installments by signing an installment sales contract . . . . [T]he dealer may assign to a financer the right to receive the monthly payments. *In substance, what this amounts to is an indirect loan from the financer to the consumer.*

> Banta, *Negotiability in Consumer Sales: The Need for Further Study,* 53 Neb.L.Rev. 195 (1974) (emphasis added).

ment." Reg. Z, 12 C.F.R. § 226.2(*l*). The Act does not apply to loans or credit sales made "for business and commercial purposes", 15 U.S.C. § 1603(1); it covers only extensions of consumer credit, defined in the Act as credit "offered or extended [to] a natural person . . . primarily for personal, family, household, or agricultural purposes." 15 U.S.C. § 1602(h). Failure to comply renders the creditor liable to the consumer in an amount equal to twice the finance charge, but not less than $100 or more than $1000. 15 U.S.C. § 1640(a). In the Act, Congress gave the Federal Reserve Board broad authority to promulgate regulations to ensure compliance. 15 U.S.C. § 1604; *see Mourning v. Family Publications Service, supra* at 365, 371–72, 93 S.Ct. at 1661, 36 L.Ed.2d at 330. Pursuant to that grant of authority, the Board promulgated Regulation Z, 12 C.F.R. § 226.1, *et seq.*

Congress defined "creditor" broadly to include all "who regularly extend, or arrange for the extension of, [consumer] credit for which the payment of a finance charge is required, whether in connection with loans, sales of property or services, or otherwise." 15 U.S.C. § 1602(f). The original Act thus contemplated two classes of creditors who were required to make disclosures in appropriate transactions. First are the "extenders" of credit, those who actually provide the funds and carry the risk of the obligation. Second are the "arrangers" of credit, those who negotiate a consumer credit transaction on behalf of a third-party extender. 15 U.S.C. § 1602(f); Reg. Z, 12 C.F.R. § 226.2(f), (m). Only those who "regularly", that is, in the ordinary course

of business, arrange or extend credit, are subject to the disclosure requirements.[7]

## The Liability of the Finance Companies Under the Act.

 In the instant case, the finance companies operated under a definite working arrangement with the Club. The evidence discloses that (1) the finance companies were alerted almost simultaneously with the customer's execution of a note; (2) an immediate credit check was then made by the finance companies; (3) if the customer's note was accepted, the finance companies paid the Club the amount of the note less the discount; (4) the finance companies accepted assignments without recourse to the Club, thus relying solely on the customer for payment; (5) the finance companies often contacted the customer the same day and upon approving him, the companies would send out their payment book describing the manner of payment and notice of late charges (not mentioned in the note assigned); (6) the finance companies carried the note on their books as a "loan" and listed a "finance charge"; and (7) thereafter, the finance companies treated the club member in the same manner as they did their direct consumer loan customers. The situation was no different than if the finance companies had gone to the Club with the prospective member, paid the Club for the membership and then taken the customer's note just as they did take it.

 We find, as have all but one of the courts faced with similar facts, that where the third-party financer becomes intimately involved in the relevant credit transactions it may become liable as an extender of

---

7. A third group of creditors subject to the Act are assignees of the original creditors. Under a 1974 amendment to the Act, subsequent assignees are liable for all violations "apparent on the face of the instrument assigned." (Act of October 28, 1974, Pub.L. No. 93–495, § 413, 88 Stat. 1500.) The instant case arose before that amendment, however, and the pre-amendment liability of assignees in transactions not involving security interests in real estate is less clear.

The plaintiffs allege that TILA as originally enacted makes the finance companies liable as

assignees under 15 U.S.C. § 1641 (1969), even if they are not liable as creditors. Since we find the finance companies are liable as creditors, we need not consider the pre-amendment scope of assignee liability. *Compare Garza v. Chicago Health Clubs, Inc.,* 347 F.Supp. 955 (N.D.Ill. 1972) *with Austin v. Ohio Furniture Co.,* 1969–73 Trans. Binder, CCH Cons. Credit Guide ¶ 99,610 (N.D.Ohio 1970). *See also* R. Clontz, Truth in Lending Manual ¶¶ 2.06[13], 2.07[2] (3d ed. 1973).

credit.[8] Where a finance company becomes an integral part of the seller's financing program, the finance company must bear full responsibility for all disclosures required under the Truth in Lending Act. Here the parties dealt on a prearranged, systematic basis. The fact that the companies did not immediately assume the obligations and could, in their discretion, reject certain notes, assumes little importance in view of the overall course of dealing and the role they actually played in financing 95 percent of the loans. In any event, what is at issue is their liability on the loans they did accept, not on those they rejected. The method of operation used here served to channel the loans to the finance companies, and the Health Club served as a mere conduit between the club members and the actual extenders of credit.

Contrary to the view taken by the district court, we find nothing in the Act which requires the extender of credit to have an interlocking directorate with an arranger or for the two to be commonly controlled in order to have the duty to disclose. Such a requirement would not further the policy of the Act which is to provide full disclosure of hidden finance costs to the consumer. The district court recognized that the regulations encompass a situation in which one party serves as a conduit or arranger of credit to be extended by a third party.[9] In order to find the *arranger* liable, *he* must operate under some "business or other relationship" with the *extender* of credit. However, there is no evidence that the Federal Reserve Board intended these words to mean anything more than pursuing in the regular course of business a practice of channeling credit business to another.[10] This obviously means more than isolated or even periodic discounting of consumer paper between commercial enterprises. Without attempting to limit the definition, we think it clearly encompasses credit transactions which are prearranged and systematically carried out as in this case. It is important to remember, though, that Regulation Z, § 226.2(f) does not discuss the requisite proof of liability as a credit extender; it relates only to the liability of one who arranges credit to be extended by another. The focal issue here, as earlier stated, is

8. *Compare Kriger v. European Health Spa, Inc.,* 363 F.Supp. 334 (E.D.Wis.1973); *Garza v. Chicago Health Clubs, Inc.,* 347 F.Supp. 955 (N.D.Ill.1972); *Glaire v. La Lanne-Paris Health Spa, Inc.,* 12 Cal.3d 915, 117 Cal.Rptr. 541, 528 P.2d 357 (Cal.1974) *with Alpert v. U. S. Ind., Inc.,* 59 F.R.D. 491 (C.D.Cal.1973). *See also Meyers v. Clearview Dodge Sales, Inc.,* 384 F.Supp. 722 (E.D.La.1974); *Manning v. Princeton Consumer Discount Co.,* 380 F.Supp. 116 (E.D.Pa.1974); *Starks v. Orleans Motors, Inc.,* 372 F.Supp. 928 (E.D.La.), *aff'd mem.,* 500 F.2d 1182 (5th Cir. 1974); *Philbeck v. Timmers Chevrolet, Inc.,* 361 F.Supp. 1255 (N.D.Ga. 1973), *rev'd on other grounds,* 499 F.2d 971 (5th Cir. 1974); *Stephanski v. Mainway Budget Plan, Inc.,* 326 F.Supp. 138 (S.D.Fla.1971).

9. Regulation Z, 12 C.F.R. § 226.2(f), defines the requisite relationship between an arranger and an extender of credit as follows:

(f) "Arrange for the extension of credit" means to provide or offer to provide consumer credit which is or will be extended by another person *under a business or other relationship* pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the *credit terms and participates in the preparation* of the contract documents required in

connection with the extension of credit. It does not include honoring a credit card or similar device where no finance charge is imposed at the time of that transaction. (Emphasis added).

10. In an informal letter interpreting the Act, the Chief of the Board's Truth in Lending Section indicated that the requisite relationship between an arranger and extender could be based merely on "accepted business practices within the community" such as referral relationships, which "are not normally evidenced by written agreements." FRB Letter No. 823 (July 24, 1975) by Jerauld C. Kluckman, CCH Cons. Credit Guide ¶ 31,145. Further, as early as 1971, the Board warned that purchasers of dealer paper might be liable under the Act:

Banks should take appropriate measures to see that they do not purchase or accept as collateral dealer paper concerning which the consumer has not received a complete and accurate disclosure statement. . . . The bank may be subject to whatever defenses or damage claims the customer may have under the Truth in Lending Act with regard to such paper.

FRB Letter No. 538 (July 21, 1971) by J. L. Robertson, CCH Cons. Credit Guide ¶ 30,752.

whether Congress intended to allow the credit transactions used here to fall outside the Act. As we have discussed, the substance of the transactions is the controlling factor. In that light, we find the arrangement a mere pretext for consumer loans which required disclosure under the Act by both the Club and the finance companies. Cf. *Twin City Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co.,* 413 F.2d 494 (8th Cir. 1969).

*The Discount as a Finance Charge.*

Finding liability, the remaining issue is whether the discount constituted a finance charge under the Act.

. The district court did not discuss whether the discount on the notes assigned to the finance companies was a finance charge which should have been disclosed by the Club.[11] The district court did note however that unitary price schemes, under which the seller offers goods for the same price whether paid in cash or on the installment plan, can hide a finance charge.[12] 386 F.Supp. at 791.

The Act defines "finance charge" as:
the sum of *all* charges, payable directly or *indirectly by the person to whom the credit is extended,* and imposed directly or *indirectly* by the creditor as an incident to the extension of credit, including

. . . any amount payable under a . . . discount . . . system.
15 U.S.C. § 1605(a) (emphasis added).

■ The fact that a particular charge may not be included in the definitions of interest found in state usury laws is not controlling, for "finance charge" under TILA was intended to include not only "interest" but many other charges for credit. H.R.Rep.No.1040, 90th Cong., 2d Sess., 2 U.S.Code Cong. & Admin.News pp. 1962, 1977 (1968). The Federal Reserve Board has ruled that discounts paid by a seller (such as the Health Club) of consumer accounts receivable must be included in the stated finance charge if and to the extent that they are passed on to the consumer. *See* 12 C.F.R. §§ 226.4(a), 226.406; FRB Letter No. 433 (Jan. 21, 1971) by Tynan Smith, CCH Consumer Credit Guide ¶ 30,-627.

■ In the instant case, it is obvious that all of the discount originally agreed upon by the Club and the finance companies was passed along to the customers as a charge for use of credit.[13] It may be, however, that some portion of the subsequent increases in the discount was not passed along to the customers and was rather absorbed by the Club as a reduction in its profit. On the other hand, adding more members may have permitted the seller so to reduce cost per member that it could provide the same services without increasing the face amount of the note.[14] The

11. Presumably, the court's reasoning was that since no "business relationship" existed and the Club was not an arranger of credit, the discount could not be a finance charge within the meaning of the Act. This analysis is somewhat inconsistent, however, with the court's statement that it did "not disagree" with the holding in *Kriger, supra,* that such a discount was a disclosable finance charge.

12. Unitary pricing schemes as an evasion of TILA are discussed in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). As Chief Justice Burger wrote in *Mourning*:
One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of "burying" the cost of credit in the price of goods sold.
411 U.S. at 366, 93 S.Ct. at 1659, 36 L.Ed.2d at 328.

13. The Club's accountant, James Sailor, said in his deposition that the $360 price for membership was based on the Club's calculation of their costs, desired profit, and the probable discount rates. He said that the Club needed to receive 80 to 85 percent of the $360 face amount.

14. The "cash price" which should have been disclosed was the price at which the seller offered in the ordinary course of business, to sell for cash. While normally that would be the price at which the seller offers to sell his goods or services for cash to a customer, that is not the case, where, as here, cash sales to customers are so rare as not to constitute a sale in the ordinary course of business. In the latter case, the amount of cash which the seller received through systematic discounting of his customer's notes is the ordinary course of busi-

**94**

district court should explore this matter on remand. *See* 12 C.F.R. § 226.406.

Since the amount of the discounts charged by the finance companies varied from time to time, it is necessary to remand to the district court for computation of the penalty to be assessed under the Act in favor of the plaintiffs and against the finance companies.

The judgment in favor of the finance companies is vacated and the cause reversed and remanded for further proceedings.

ROSS, Circuit Judge (dissenting).

In my opinion the plaintiffs have failed to show a sufficient relationship between the health clubs and the defendant finance companies at the time the notes were executed in order to invoke the remedies of TILA. I would affirm on the basis of the well reasoned opinion of Judge Nangle. *Joseph v. Norman's Health Club, Inc., supra.*

ness price. *See Kriger v. European Health Spa, Inc.,* 363 F.Supp. 334, 338 (E.D.Wis.1973); *Glaire v. La Lanne-Paris Health Spa, Inc.,* 12 Cal.3d 915, 117 Cal.Rptr. 541, 528 P.2d 357, 364 (Cal.1974).