[No. D039145. Fourth Dist., Div. One. Oct. 15, 2002.]

LINDA SEARLE, Plaintiff and Appellant, v.
WYNDHAM INTERNATIONAL, INC., Defendant and Respondent.

1328

## COUNSEL

Morris and Associates, Stephen B. Morris and Mark C. Hinkley for Plaintiff and Appellant.

Baker & McKenzie, Charles H. Dick, Jr., Katherine A. Bacal and Scott W. Sigman for Defendant and Respondent.

## OPINION

**BENKE, J.**—In the end, we find that how and what a hotel pays its room service servers is a matter between the hotel and the servers. Accordingly, we affirm the judgment entered on an order sustaining without leave to amend a hotel's demurrer to an unfair business practice complaint brought by a hotel patron. The patron alleged a 17 percent service charge the hotel adds to its room service bills is paid directly to room service servers and that, in failing to expressly advise patrons about this aspect of the server's compensation, the hotel is engaging in a deceptive practice which induces patrons to pay gratuities patrons would not otherwise feel obligated to provide. Because there is no allegation the hotel deceives its guests about the costs of its room service meals and because patrons are free to both obtain meals outside their rooms and to provide as small or as large a gratuity as they wish, the hotel's billing practice is not actionable.

### SUMMARY

According to the allegations of the complaint, which we accept as true,[1] on July 10, 2001, plaintiff and appellant Linda Searle stayed with her husband at the Wyndham Plaza Hotel in San Diego, which is operated by defendant Wyndham International, Inc. (Wyndham). The Searles ordered room service from a room service menu, which in pertinent part stated: "A 17% service Charge and Applicable State Tax will be added. In Room Delivery Charge $3." When their room service meal arrived, in addition to the service charge and room delivery charge, the bill they received included a blank line for a tip or gratuity. Searle further alleges, based on information and belief, that the 17 percent service charge included a gratuity paid to the server.

According to Searle the hotel's room service billing practice is deceptive because guests are not advised the service charge is in fact a gratuity paid to the server. Searle also contends the service charge is unfair because it compels guests to pay a gratuity, which Searle believes should be entirely

---

[1] "In assessing the sufficiency of a complaint against a general demurrer, we must treat the demurrer as admitting all material facts properly pleaded. [Citations.] Furthermore, we bear in mind our well established policy of liberality in reviewing a demurrer sustained without leave to amend: 'the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties.' [Citations.]" (*Glaire v. La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357].)

voluntary. Thus Searle alleges the hotel's room service practices violate the unfair competition law (UCL), Business and Professions Code[2] section 17200, as well as the more specific advertising provisions of section 17500. Finally, Searle alleges that because other hotel patrons were subjected to the same practice, her claims would support class treatment under Code of Civil Procedure section 382 and Civil Code section 1781, subdivision (a).

Wyndham filed a demurrer to the complaint and the trial court sustained the demurrer without leave to amend and dismissed the action. Searle filed a timely notice of appeal.

## DISCUSSION

### I

Before we reach the merits of Searle's claims, some background on the subject of tipping is useful. Although it has been subjected to vigorous criticism and attempts to regulate and even prohibit it since its advent in this country in the latter half of the 19th century, the practice of tipping the providers of personal service has endured and is now a well-accepted part of our day-to-day lives. (See Segrave, Tipping (1998) p. vii (Segrave).) Its acceptance however has not left the subject without controversy. Because a tip is entirely gratuitous, entirely subjective and very personal, it has been the repeated subject of pundits, advice columnists and entertainers. Eleanor Roosevelt offered the following to Americans travelling abroad: " 'a fair tip, or one a little on the generous side, will leave a pleasant feeling and respect for you in the one who receives it. A lavish one will create a secret disrespect and add to the reputation Americans have for trying to buy their way into everything.' " (Segrave, *supra*, pp. 53-54.) In *A Night at the Opera,* Groucho Marx offered a different perspective:

" 'GROUCHO: Do they allow tipping on the boat?

" 'STEWARD: Oh, yes sir!

" 'GROUCHO: Have you got two fives?

" 'STEWARD: Yes, sir!

" 'GROUCHO: Well, then, you won't need the 10 cents I was going to give you!' " (Segrave, *supra*, p. 146.)

---

[2]All further statutory references are to the Business and Professions Code unless otherwise indicated.

On a more academic level, "Scholarly papers on the custom [have] studied every aspect of tipping imaginable." (Segrave, *supra*, p. 138.) The impact of large parties, the impact of waitresses wearing flowers in their hair, the impact of the attractiveness of waitresses, the impact of credit cards, the impact of being touched by a waitress, the impact of alcohol consumption by patrons, the impact of squatting to make direct eye contact with the customer have all been studied, as have the perceptions of servers and customers themselves about factors associated with tipping. (*Id.* at pp. 138-144.) One recurring theory and fundamental criticism of tipping attributes its resiliency to the desire of the tipper to feel, if not better than the server, better about himself or herself in an otherwise awkward social situation. (*Id.* at p. 146.)

Eleanor Roosevelt, Groucho Marx and the host of scholars notwithstanding, tips are an important part of many service employees' income and, for those who must travel to earn a living, a substantial expense. (Segrave, *supra,* pp. 56, 138-139.) Indeed, given its role in the compensation of so many workers, tipping is the express subject of Labor Code section 351, which prevents employers from deducting from servers' wages any amount they receive by way of tips or gratuities.[3] "The purpose of section 351, as spelled out in the language of the statute, is to prevent an employer from collecting, taking, or receiving gratuity income or any part thereof, as his own part of his daily gross receipts, from deducting from an employee's wages any amount on account of such gratuity, and from requiring an employer to credit the amount of the gratuity or any part thereof against or as a part of his wages. And the legislative intent reflected in the history of the statute, was to ensure that employees, not employers, receive the full benefit of gratuities that patrons intend for the sole benefit of those employees who serve them." (*Leighton v. Old Heidelberg, Ltd.* (1990) 219 Cal.App.3d 1062, 1068 [268 Cal.Rptr. 647]; see also *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1265 [252 Cal.Rptr. 278, 762 P.2d 442]; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 730 [166 Cal.Rptr. 331, 613 P.2d 579].)

With this brief background in mind, we turn to a fundamental source of consumer protection in this state, the UCL.

II

The UCL defines "unfair competition" to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive,

---

[3]Labor Code section 351 states in pertinent part: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for."

untrue or misleading advertising" and any act prohibited by section 17500. (§ 17200.) Section 17500 in turn prohibits advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." "Section 17200 'is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. [Citation.] Thus, California courts have consistently interpreted the language of section 17200 broadly.' [Citation.]" (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877-878 [85 Cal.Rptr.2d 301].) The statute prohibits "wrongful business conduct in whatever context such activity might occur." (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111 [101 Cal.Rptr. 745, 496 P.2d 817], fn. omitted.) In *Barquis* the court found the statute covered a collection agency's practice of filing complaints against debtors in improper venues. In contrast, in *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519 [63 Cal.Rptr.2d 118], the court applied the statute to a ski resort operator who had unlawfully cut down 1,800 trees on land it controlled.

" ' "The statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone." ' [Citation.] To state a claim under section 17200, a plaintiff 'need not plead and prove the elements of a tort. Instead, one need only show that "members of the public are likely to be deceived." ' [Citations.] 'Allegations of actual deception, reasonable reliance, and damage are unnecessary.' [Citations.] Further, the statute authorizes 'courts to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice.' [Citations.] Because section 17200's definition is 'disjunctive,' the statute is violated where a defendant's act or practice is unlawful, unfair, fraudulent or in violation of section 17500. [Citation.]" (*South Bay Chevrolet v. General Motors Acceptance Corp., supra,* 72 Cal.App.4th at pp. 877-878, fn. omitted.)

Given the role gratuities play in so many transactions and in the livelihoods of so many workers, we have no doubt that any business practice which substantially impacts tipping must meet the broad requirements of the UCL, as well as the closely related provisions of section 17500.

III

Searle has not cited any law which Wyndham's room service practice violates. Indeed, other than Labor Code section 351, we are not aware of any express regulation of tipping on room service billing. Because Wyndham's practice is alleged to cause servers to receive more in the way of

tips than would otherwise occur, it plainly does not violate the spirit or letter of Labor Code section 351. In sum, the complaint cannot be maintained on the basis Wyndham has engaged in an "unlawful" business practice.

■ " 'The "unfair" standard, the second prong of section 17200' offers 'an independent basis for relief.' [Citation.] 'This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . ." ' [Citations.] '. . . . [A]n "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.] 'In general the "unfairness" prong "has been used to enjoin deceptive or sharp practices. . . ." ' [Citation.] However, the 'unfairness' prong of section 17200 'does not give the courts a general license to review the fairness of contracts . . . .' [Citation.]" (*South Bay Chevrolet v. General Motors Acceptance Corp., supra,* 72 Cal.App.4th at pp. 886-887, fn. omitted.)

■ Searle argues that in imposing the 17 percent service charge and failing to disclose to guests that the service charge is paid to the servers, Wyndham is acting unfairly in two respects: it is compelling payment of a gratuity which should otherwise be entirely voluntary, and second it is tricking consumers into paying servers more than they would otherwise provide by way of a tip. The difficulty we have with this argument is its premise: that because the 17 percent service charge is paid entirely to the server, we must therefore treat it as a gratuity. Neither logic nor the customs and usages associated with tipping support such a conclusion.

Anyone who has debated with a small child about the temptations presented by an in-room minibar stocked with $3 candy bars and $2 sodas will recognize that a hotel has many means of generating revenue from its guests. What a hotel does with the revenue it earns—from either the minibar, in-room movies or its room service charges—is of no direct concern to hotel guests. The minibar patron, like the room service patron, is given both clear notice the service being offered comes at a hefty premium and the freedom to decline the service. Just as the hotel patron has no legitimate interest in what the hotel does with the large premium it earns from its minibar snacks, the patron has no legitimate interest in what the hotel does with the service charge. The hotel is free to retain for itself the large premium, as well as the service charge, or to remit all or some of the revenue to its employees.

Because the service charge is mandatory and because the hotel is free to do with the charge it as it pleases, the service charge is simply not a gratuity which is subject to the discretion of the individual patron.

Moreover, the hotel's decision to compensate its room service servers by way of the 17 percent service charge in no material way interferes with the patron's reasonable expectations with respect to the custom of tipping. As commentary, custom and Labor Code section 351 make clear, tipping is solely a matter between patron and server. While some patrons will care about what the server receives from his employer, others will not. The curiosity of those who, like Groucho, want to know how much the server has in his pocket is just that: curiosity. It is a curiosity about something, i.e., the server's financial condition, in which the tipper has no legitimate interest.

For largely the same reasons we reject Searle's contention that the hotel's service charge practice is fraudulent. We of course recognize that "[t]he ' "fraud" contemplated by section 17200's third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived.' " (*South Bay Chevrolet v. General Motors Acceptance Corp, supra*, 72 Cal.App.4th at p. 888.) " 'This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.' " (*Ibid.*) However, in arguing that it is deceitful to fail to clearly notify hotel guests that the service charge is paid to the server, Searle again assumes the patron has some right to know what the hotel is paying the room service server. As our discussion of the unfairness prong of the UCL indicates, we are not willing to indulge the notion that the custom of tipping somehow gives patrons the right to know how much a server is being paid by his or her employer. In this situation the only obligation the hotel has to the patron is the one codified in Labor Code section 351: an assurance that, however large or small, the tip will go to the server, not the employer. Wyndham's compensation practices of course fully meet this obligation. In sum, in failing to advise its guests as to how it compensates its employees, the hotel is not guilty of any deceit even under the broad provisions of the UCL.

Searle's claims under the false advertising provisions of section 17500 fail for the same reason. The hotel has no obligation to advise consumers about what it does with the revenue it receives from them.

Given our disagreement with Searle's fundamental assumption that she had a right to know how the room service servers are paid by the hotel, we find no abuse of discretion in the trial court's unwillingness to give her leave

to amend. This case does present an instance where there is no reasonable likelihood the plaintiff will be able to state a valid cause of action. (*Hepe v. Paknad* (1988) 199 Cal.App.3d 412, 421 [244 Cal.Rptr. 823]; *Leakes v. Shamoun* (1986) 187 Cal.App.3d 772, 778 [232 Cal.Rptr. 171].)

## CONCLUSION

In the final analysis we are not offended by the hotel's practice of treating the service charge as a means of providing reliable compensation to its employees and not as a substitute for the customary tip. The hotel's service charge practices provide a guaranteed level of compensation for its servers and at the same time encourage its servers to provide the hotel's guests with good service. Indeed, anecdotal evidence collected by Segrave offers a very sound reason why it is a hotel would not want to call the service charge a gratuity and thereby limit its servers' ability to earn generous tips: "The Pittsburgh Athletic Association was a private club with a no-tip policy (common in U.S. private clubs) with a 10 percent service charge substituted. This club found many of its members tipped anyway. Explained one member: 'It's a no-tip club ostensibly, but you don't get very good service if you don't add a tip.'" (Segrave, *supra*, pp. 94-95, fn. omitted.)

Judgment affirmed. Respondent to recover its costs.

Kremer, P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied October 24, 2002.